UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

ALICJA NIVER,                                          :

                    Petitioner,            :   CIVIL NO.  3:02CV1786(JCH)

      v.                                              :

IMMIGRATION AND NATURALIZATION   :
SERVICE,

                             :

                  Respondent.            NOVEMBER 21, 2003


## GOVERNMENT'S RESPONSE TO
## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

The respondent, Immigration and Naturalization Service (INS),[1] through its undersigned

counsel, hereby responds to the amended petition for writ of habeas corpus filed on behalf of

Alicja Niver.  As explained below, the amended petition should be dismissed for lack of

jurisdiction because petitioner failed to exhaust her administrative remedies as to the claims

raised in the amended petition.  Further, even if the Court reaches the merits of Niver's new

claims, despite this jurisdictional defect, the claims are without merit.  Accordingly, the amended

petition should be denied.

---

[1] On March 1, 2003, the INS was abolished and its functions were transferred from the
Department of Justice into three bureaus within the Department of Homeland Security ("DHS")
pursuant to the Homeland Security Act of 2002. See Pub. L. No. 107-296, 116 Stat. 2135, 2178.
The enforcement functions of INS were transferred to the Bureau of Immigration and Customs
Enforcement ("ICE"). Id.

## BACKGROUND[2]

Petitioner Alicja Niver a/k/a Alicja Szymanski is a native and citizen of Poland who

entered the United States on July 10, 1979, as a visitor for pleasure. Her status was adjusted to

that of a lawful permanent resident on April 16, 1980. Petitioner forfeited her opportunity to

remain in the United States, however, when she committed and was convicted on December 3,

1999, in the Superior Court at Bantam, Connecticut, of Robbery 3rd Degree and Larceny 3rd

Degree, in violation of Conn. Gen. Stat. §§ 53a-136 and 53a-124, respectively.[3] See Govt. Resp.

dated Dec. 10, 2002 (hereinafter "Govt. Resp. I") , Ex. A-1, *Information*; Ex. A-2, *Order of*

*Probation*. Petitioner was sentenced to five years imprisonment on each count, the first

suspended after three years of imprisonment, and the second suspended completely and to run

consecutive to count one. See Govt. Resp. I, Ex. A-2, *Order of Probation*.

As a consequence of these convictions, the INS initiated proceedings to remove petitioner

from the United States as an aggravated felon, pursuant to the Immigration and Nationality Act

("INA") § 237(a)(2)(A)(iii); 8 U.S.C. § 1227(a)(2)(A)(iii). See Govt. Resp. I, Ex. A-3, *Notice to*

*Appear dated 2/5/2001*. See also INA §§ 101(a)(43)(F) and (G); 8 U.S.C. §§ 1101(a)(43)(F) and

(G). On April 29, 2002, an Immigration Judge ("IJ") ordered petitioner removed to Poland. See

---

[2] Most of the information in this section is already before the Court as it is included in the Government's response to the original habeas petition, filed December 10, 2002, as well as the notice of intent to remove filed February 13, 2003. In the interest of placing all information before the Court in one document, the factual and procedural history of this case is repeated herein. However, unless otherwise noted, all exhibits referenced herein are attachments to the Government's first response and notice of intent to remove.

[3] Petitioner's criminal history actually dates back to 1992, and includes several convictions, including for possession of cocaine and marijuana, passing bad checks, and larceny, in Florida, West Virginia and Connecticut.

Govt. Resp. I, Ex. A-4, *IJ Order of Removal*. On May 23, 2002, petitioner timely filed an appeal

of the order of removal with the Board of Immigration Appeals. See Govt. Resp. I, Ex. A-5,

*Notice of Appeal* and *BIA Receipt of Appeal*.

On October 9, 2002, prior to the BIA deciding her administrative appeal, petitioner filed a

habeas petition in this Court, challenging the IJ's removal order. On December 10, 2002, the

Government filed a response to the petition arguing for dismissal for lack of jurisdiction based on

petitioner's failure to exhaust administrative remedies because her appeal was still pending with

the BIA. On December 18, 2002, the BIA dismissed petitioner's administrative appeal finding

that she conceded in the Immigration Court that her convictions render her removable as charged.

See Notice of Intent to Remove dated Feb. 13, 2003, Ex. A-6, *BIA Decision*. The BIA

additionally rejected petitioner's unsupported claim, which she also made in her initial habeas

petition, that the BIA recently "issued a precedent decision which would alter her removability as

an aggravated felon." See id. at n.1.

On February 13, 2003, respondent filed a notice of intent to remove petitioner because the

INS had received a travel document for Niver from the Consulate of Poland. On March 6, 2003,

the Court granted Niver's request for a stay of removal. On September 25, 2003, petitioner filed

an amended habeas petition in which she asserts various new challenges to her final removal

order.[4]

---

[4] Niver, through counsel, had previously sought to amend her petition to include the
same grounds raised herein, but the Court (Thompson, J.) did not rule on the motion prior to
transferring the case to this Court.

**ARGUMENT**

In her amended petition, Niver raises several new challenges to her removal order.  First,

petitioner claims she is not subject to removal "because she is a 'national of the United States'"

(Am. Pet. ¶ 5.1).  Next, petitioner claims the removal order violates various international treaties,

including the International Covenant on Civil and Political Rights (ICCPR) (Am. Pet. ¶ 5.2), the

Universal Declaration of Human Rights (UDHR) (Am. Pet. ¶ 5.3),  and the Convention on the

Rights of the Child (CRC) (Am. Pet. ¶ 5.4).  Finally, Niver argues that her state convictions, and

specifically the 1999 convictions on which her removal is based, are invalid because (1) she

allegedly was not advised by arresting officers of her right to contact her consular officer in

violation of the Vienna Convention on Consular Relations (VCCR) (Am. Pet. ¶ 5.5); (2) her

guilty plea was made in ignorance of the collateral consequences of removal (Am. Pet. ¶ 5.6) and

(3) her counsel at the state level rendered ineffective assistance in that her counsel failed to (a)

advise Niver of the immigration consequences of her guilty plea (Am. Pet. ¶ 5.7) and (b) confer

adequately with Niver regarding a potential motion to suppress her "confession" on the ground

that arresting officers violated her rights under the VCCR.  (Am. Pet. ¶ 5.8).

As explained below, these new claims are subject to dismissal for lack of jurisdiction

primarily because petitioner failed to raise these claims in her appeal to the BIA.  What's more,

even if the Court reaches the merits of the claims, despite the jurisdictional defects explained

herein, they must fail as they are without merit.

**I.**     **Petitioner Waived The Claims Raised In The Amended Petition**
        **By Failing To Raise Them At The Administrative Level.**

Although petitioner appealed the IJ's order of removal to the Board of Immigration

Appeals on grounds asserted in her original petition, she did not raise with the BIA the claims raised in her amended petition.[5] Accordingly, this Court lacks jurisdiction to review the unexhausted claims.

The INA specifically requires that all available administrative remedies be exhausted before seeking judicial review of a final removal order. See INA § 242(d), 8 U.S.C. 1252(d) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as a right."). It is well-established that "[w]here exhaustion is required, a court must dismiss any unexhausted claim for lack of jurisdiction." Theodoropoulos v. INS, 313 F.3d 732, 736 (2d Cir. 2002) (applying Section 242(d) in holding that district court lacked habeas jurisdiction to review claim not exhausted before BIA) (citations omitted). See also United States v. Gonzalez-Roque, 301 F.3d 39, 49 (2d Cir. 2002) (petitioner forfeited his due process claim by failing to raise this specific claim before the BIA); Arango-Aradondo v. INS, 13 F.3d 610, 613-14 (2d Cir. 1994) (declining to consider constitutional claim for ineffective assistance of counsel that was not raised before the BIA); Custodio v. INS, No. 3:02cv155, 2002 WL 1608329 * 2-3 (D. Conn. June 28, 2002) (Droney, J.) (holding that alien failed to exhaust Convention Against Torture claim because she did not previously raise claim in administrative removal proceedings); Hylton v. INS, No. 01 Civ 11849, 2003 WL 1537385 *3 (S.D.N.Y. Mar. 24, 2003) (same).

---

[5] The Court has not yet decided the claims initially raised by petitioner that were, at the time of the Government's initial response, still pending before the BIA. However, petitioner did not pursue those claims in her amended petition. To the extent the Court deems the original claims not abandoned, the correctness of the BIA's decision affirming the IJ's order of removal on grounds that petitioner was convicted of an aggravated felony is plain. Should the Court need additional briefing on this issue, respondent would seek additional time to supplement.

The Second Circuit has repeatedly recognized the myriad purposes of the administrative exhaustion doctrine, which include "protecting the authority of administrative agencies, limiting interference in agency affairs, and promoting judicial efficiency by resolving potential issues. . . ., Beharry v. Ashcroft, 329 F.3d 56, 59 (2d Cir. 2003), as well as "preventing the 'frequent and deliberate flouting of administrative processes [that] could weaken the effectiveness of an agency.'" Bastek v. Federal Crop Ins. Co., 145 F.3d 90, 93-94 (2d Cir. 1998) (quoting McKart v. United States, 395 U.S. 185, 193-95 (1969)).

Further, the Supreme Court and Second Circuit have made clear that, when statutorily required, exhaustion of administrative remedies is jurisdictional and must be strictly enforced, without exception. See McCarthy v. Madigan, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is required."); Coit Independence Joint Venture v. Federal Savings and Loan Ins. Corp., 489 U.S. 561, 579 (1989) ("[E]xhaustion of administrative remedies is required where Congress imposes an exhaustion requirement by statute."); Theodoropoulos, 313 F.3d at 736.  In Bastek, the Second Circuit explained that

> [t]wo kinds of exhaustion doctrine are currently applied by the courts, and the distinction between them is pivotal.  Statutory exhaustion requirements are mandatory, and courts are not free to dispense with them.  Common law (or 'judicial') exhaustion doctrine, in contrast, recognizes judicial discretion to employ a broad array of exceptions that allow a plaintiff to bring his case in district court despite his abandonment of the administrative review process.
>
> * * *
>
> Faced with unambiguous statutory language requiring exhaustion of administrative remedies, '[w]e are not free to rewrite the statutory text.'

Bastek, 145 F.3d at 94 (citing McNeil v. United States, 508 U.S. 106, 111 (1993) and McCarthy, 503 U.S. at 144 ("Where Congress specifically mandates, exhaustion is required.  But where

Congress has not clearly required exhaustion, sound judicial discretion governs.")). See also

Booth v. Churner, 532 U.S. 731, 741 & n. 6 (2001) (holding that Congress, in the Prison

Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), "has mandated exhaustion clearly

enough, regardless of the relief offered through the administrative procedures [and] we stress the

point . . . that we will not read futility or other exceptions into statutory exhaustion requirements

where Congress has provided otherwise.").[6]

Indeed, the Second Circuit in Theodoropoulos recently applied the current statutory

exhaustion requirement of INA § 242(d), 8 U.S.C. § 1252(d)(1), in dismissing a habeas petition

challenging an order of removal, where the petitioner had waived appeal of the removal order to

the BIA. See Theodoropoulos, 313 F.3d at 736-37 (citing Mejia-Ruiz v. INS, 51 F.3d 358, 364

(2d Cir. 1995)).[7]  However, a different panel of the Second Circuit later observed in Beharry that

the court in Theodoropoulos "treated § 242(d)(1), the successor provision to § 106(c), as a

statutory exhaustion requirement when applied to a habeas petitioner, but . . . did not discuss or

consider the impact of [the Supreme Court's decision in] St. Cyr[8] on the applicability of §

---

[6]  But see Beharry, 329 F.3d at 61-62 & n.1 (declining to decide whether statutory
exhaustion under former INA Section 106(c) applies to habeas petitioners, instead applying
judicial exhaustion and finding that because Beharry failed to present his claim for relief under
INA § 212(h) to the IJ and BIA, "it would be an abuse of discretion on the facts of this case for
the district court to exercise jurisdiction."); Hinds v. Ashcroft, No. 3:03CV503, 2003 WL
21459547 (D. Conn. June 19, 2003) (Arterton, J.) (same).

[7]  See also Brooks v. INS, No. 3:02CV02146, 2003 WL 1987003 (D. Conn. Apr. 17,
2003) (Thompson, J.) (applying § 242(d)(1) in dismissing a habeas petition for lack of
jurisdiction where petitioner failed to exhaust administrative remedies as his appeal to the BIA
was untimely).

[8]  St. Cyr v. INS, 533 U.S. 289 (2001).

242(d)(1) in the habeas context." 329 F.3d at 60. The court in <u>Beharry</u> thus declined to decide whether former INA § 106(c), the predecessor provision to § 242(d)(1), imposed an exhaustion requirement on habeas petitioners, concluding that "it is *potentially* an open question whether the exhaustion requirement of § 106(c) applies in a habeas proceeding." <u>Id.</u> (emphasis added).[9]

Despite the Second Circuit's reluctance to decide the issue in <u>Beharry</u>, exhaustion of administrative remedies is expressly required by INA § 242(d), and applies to cases such as this where petitioner seeks review of a final order of removal by way of habeas petition under 28 U.S.C. § 2241. Case law from other circuits support this conclusion. For instance, the Eleventh Circuit held squarely in <u>Sundar v. INS</u>, 328 F.3d 1320, 1324-26 (11th Cir. 2003), <u>cert</u>. <u>denied</u>, --- S. Ct. ---, 2003 WL 21693526 (Nov. 10, 2003), that section 242(d)(1)'s exhaustion requirement barred a habeas action where the petitioner had failed to appeal to the BIA. The Third Circuit likewise has applied the statutory exhaustion requirement of INA § 242(d)(1) to preclude review of a removal order in habeas proceedings. See <u>Duvall v. Elwood</u>, 336 F.3d 228 (3d Cir. 2003).[10]

---

[9]    <u>Theodoropoulos</u> was decided December 18, 2002, and amended December 20, 2002, but the mandate has not yet issued. The panel in <u>Theodoropoulos</u> denied the request of *amici* for rehearing on the issue of the petitioner's eligibility for relief under former section 212(c). However, on June 10, 2003, after the opinion in <u>Beharry</u> was issued, the <u>Theodoropoulos</u> panel *sua sponte* appointed counsel for petitioner and requested counsel for both parties to further brief the applicability of INA § 242(d)(1) to the petitioner's habeas petition under 28 U.S.C. § 2241.

[10]    <u>See</u> also <u>Kurfees v. INS</u>, 275 F.3d 332. 336 (4th Cir. 2001) (applying former section 106(c) in holding that an alien could not "bypass the administrative process by bringing a habeas action in the district court []" after she failed to appeal to the BIA either an earlier deportation order or an order denying reopening); <u>Goonsuwan v. Ashcroft</u>, 252 F.3d 383, 385 (5th Cir. 2001) (concluding that statutory exhaustion requirement of Section 106(c) applied to habeas petitioner and deprived the district court of jurisdiction to review ineffective assistance of counsel claim where alien failed to exhaust claim before BIA); <u>cf</u>. <u>Roldan v. Racette</u>, 984 F.2d 85, 90 (2d Cir. 1993) (holding that the last sentence of former Section 106(c) prohibiting judicial review where an alien has been deported "constitutes a clear jurisdictional bar, and admits of no exceptions.").

Moreover, much of the Second Circuit's discussion in Beharry supports the conclusion that the Supreme Court's decision in St. Cyr does not preclude application of the statutory exhaustion requirement to habeas petitioners. The court in Beharry cited for its reluctance in deciding the issue the language in St. Cyr noting the historical distinction between "judicial review" and "habeas corpus." See Beharry, 329 F.3d at 60 (citing St. Cyr, 533 U.S. at 311-12). However, the Beharry court also suggested reasons why the statutory exhaustion requirement should be read to apply. See id. at 61. First, regarding the statute's construction and, specifically, the exclusion of the term "habeas corpus" from the first sentence of former INA § 106(c) (the predecessor to § 242(d)), the court observed:

> [I]t is hard to see how inclusion of habeas could be made more explicit in that construction except by the awkward emendation 'shall not be reviewed *or habeas corpused* by any court,' something Congress could have foregone on the theory that a bar on habeas review was implicit because the sentences that follow refer repeatedly to petitions 'for review or habeas corpus.' It may also be that the passage can be read to clarify itself by the flat and broad prohibition . . . that '[n]o review or habeas corpus shall be entertained if the validity of the order [of deportation or exclusion] has been previously determined in any civil or criminal proceeding.'

Id. at 61.[11] The Beharry court further acknowledged that application of the INA's statutory exhaustion provision to habeas petitions would not raise the same constitutional concern at issue in St. Cyr, that is, the complete preclusion of habeas corpus jurisdiction. Id. at 61 ("A similar

---

[11] While the sentence in former § 106(c) setting forth the exhaustion requirement does not mention habeas explicitly, it does explicitly apply to orders of exclusion as well as deportation, and before IIRIRA, exclusion orders were reviewable only via habeas. See former INA § 106(b), 8 U.S.C. § 1105a(b) (Supp. II 1996). It may be concluded without difficulty then that the reference in § 106(c) to exclusion orders must have meant that the provision's exhaustion requirement applied to habeas petitions; otherwise, the reference to exclusion orders would be a nullity.

constitutional issue would not arise if we read the exhaustion requirement of § 106(c) to apply to habeas petitioners.").

The Eleventh Circuit in <u>Sundar</u> soundly rejected the argument that a distinction should be drawn between "habeas review" and "judicial review" to preclude application of the statutory exhaustion provision to habeas petitions. In so doing, the court explained:

> The exhaustion requirement of § 1252(d)(1) is not tantamount to a complete preclusion of jurisdiction. Telling a petitioner that he must seek the remedy for an error before an administrative agency or another court prior to seeking it in a habeas proceeding is not the same thing as telling him that he may not pursue the remedy in a federal habeas proceeding in any event. . . . Section 1252(d)(1), unlike the provisions involved in *St. Cyr*, does not invoke the rule disfavoring the repeal of habeas jurisdiction, because it does not repeal habeas jurisdiction. It only conditions that jurisdiction and its exercise on exhaustion of remedies, a condition that serves valuable interests.

<u>Sundar</u>, 328 F.3d at 1324-25.

Further, the legislative history of IIRIRA indicates that INA §§ 242(c)-(d) were intended to re-codify and restate the exhaustion requirement at former INA § 106(c), 8 U.S.C. § 1105a(c) (Supp. II 1996).[12] Thus, §§ 242(c) and (d) were meant to be read together.[13] Section 242(c)

---

[12] <u>See</u> H. R. Conf. Rep. No. 828, 104th Cong., 2d Sess. at 220 (1996), *available at* 1996 WL 563320 ("[s]ection 242(d) restates the provisions in the first * * * sentence[] of subsection (c) of current section 106 requiring that a petitioner have exhausted administrative remedies").

[13] INA § 242(c) entitled "Requirements for petition," provides in pertinent part:

A petition for review *or for habeas corpus* of an order of removal –
(1) shall attach a copy of such order, and
(2) shall state whether a court has upheld the validity of the order, . . . .

8 U.S.C. § 1252(c) (emphasis added). INA § 242(c) must be read in conjunction with INA § 242(d), entitled "Review of final orders," which provides in pertinent part:

A court may review a final order of removal only if –

directs that a petition for review or for writ of habeas corpus state whether another court has

upheld the validity of the removal order.  Then, taking the answer to that question, Section

242(d)(2) provides that, in situations in which another court has reviewed the removal order,

further review is precluded.  Further, Sections 242(d)(1) and (2) are conjunctive; that is, there

must be exhaustion of administrative remedies and another court cannot have decided the

validity of the order.  As Sections 242(c)(2) and (d)(2) are connected in that the answer to a

requirement of the former dictates the availability of review in the latter, and as Section 242(c)

clearly speaks of both habeas corpus petitions and petitions for review, the statutory exhaustion

requirement remains intact for habeas review of final orders of removal.  See United States v.

Menasche, 348 U.S. 528, 538-39 (1955) ("[i]t is our duty 'to give effect, if possible, to every

clause and word of [the] statute, . . . .'")(quoting Montclair v. Ramsdell, 107 U.S. 147, 152,

(1883)); Pennsylvania Dept. of Public Welfare v. Davenport, 495 U.S. 552, 562 (1990) ('Our

cases express a deep reluctance to interpret a statutory provision so as to render superfluous other

provisions in the same enactment.'); In re Mazzeo, 131 F.3d 295, 302 (2d Cir. 1997).

    In sum, because petitioner failed to raise the claims in her amended habeas petition with

the administrative agency, as statutorily required, she has waived review of them in this habeas

proceeding.[14]

---

    (1) the alien has exhausted all administrative remedies available to the alien as of
right, and
    (2) another court has not decided the validity of the order, . . . .

Id; 8 U.S.C. § 1252(d).

[14]  While this Court has in another case held that the statutory exhaustion requirement
found in INA § 242(d), 8 U.S.C.  § 1252(d), does not apply to habeas petitions seeking review of

## II.    No Exceptions To The Statutory Exhaustion Requirement Apply.

Nor are any exceptions to the statutory exhaustion requirement warranted on these facts.

Citing and quoting the Supreme Court's decision in Booth, 532 U.S. at 741 n.6, and the Second

Circuit's decision in Bastek,145 F.3d at 94-95, the court observed in Beharry that "futility

exceptions" may not be read into statutory exhaustion requirements, and that those requirements

must be enforced unless "the relevant administrative procedure lacks authority to provide any

relief or to take any action whatsoever in response to a complaint." Beharry, 329 F.3d at 58.

Accord Sundar, 328 F.3d at 1326.[15]

In any event, unlike cases that have dispensed with the exhaustion requirement on futility

grounds,[16] the BIA has the institutional authority to decide Niver's claim that she is a "national"

_____

final orders of removal, but rather only to petitions for review filed in the court of appeals, see
Jankowski v. INS, 138 F. Supp. 2d 269, 275 n. 6 (D. Conn. 2001) (Hall, J.), rev'd on other
grounds, 291 F.3d 172 (2d Cir. 2002), respondent urges the Court to reconsider its position in
light of the interplay between § 242(d) and § 242(c), the legislative history, and the decisions in
Theodoropoulos, Sundar, and Duvall, supra.

[15] The Court noted in Beharry that its decision in Theodoropoulos can be read to excuse a
petitioner from even a statutory exhaustion requirement where the petitioner has raised a
"substantial constitutional question," see 313 F.3d at 737, but further noted the existence of the
petition for rehearing, and that such an exception may be contrary to Bastek and the Supreme
Court's opinion in Booth. 329 F.3d at 58 n.11.

[16] The Supreme Court gave no indication in Booth that its broad proscription against
reading "futility" exceptions into statutory exhaustion requirements applied only to the Prison
Litigation Reform Act.  532 U.S. at 741 n.6.  Booth has been cited by the First, Eleventh and
Ninth Circuits in non-PLRA contexts.  See Frazier v. Fairhaven School Committee, 276 F.3d 52,
61-62 (1st Cir. 2002)(applying the holding in Booth in an action under 42 U.S.C. § 1983, alleging
violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.,
and holding that plaintiffs were required to comply with the statutory exhaustion requirements of
IDEA, 20 U.S.C. § 1415(l), prior to bringing suit in federal court, and rejecting plaintiffs' futility
argument based on fact that administrative agency did not have authority to grant the only relief
requested by plaintiffs - - monetary damages); Love v. Delta Air Lines, 310 F.3d 1347, 1355-56

of the United States, which involves interpretation and application of the INA, the statute the

agency is charged with administering.  Whether Niver would have been likely to prevail before

the BIA on this claim is irrelevant to the exhaustion requirement.  The BIA further could have

considered whether it had jurisdiction to determine whether petitioner's international law claims

could provide relief from removal apart from any relief provided for in the INA.

Indeed, in Beharry, the Second Circuit impliedly rejected the argument  that the BIA

could not have, at the least, considered whether the claim that international law must be reviewed

when interpreting Section 212(h) - - i.e., whether international law claims were outside the scope

of the IJ or Board's authority to consider under the INA.  It stated that:

> Beharry argues that "it would clearly be futile to request at the administrative
> proceedings that § 212(h) be interpreted and applied in a manner consistent with
> international law as neither the IJ nor the BIA could provide such relief."
> Petitioner's Brief at 13.  The cases on which Beharry relies for this proposition,
> however, hold only that the IJ and the BIA do not have jurisdiction over claims
> for relief that are outside the scope of the INA and are instead based solely on
> customary international law or treaty law.  See In re Medina, 19 I. & N. Dec. 734,
> 742, 746 (BIA 1988) ("[E]ven if it were assumed that customary international law
> could provide a basis for individual aliens to assert a right that their deportation be
> withheld, . . . [t]he authority to consider such requests has not been delegated by
> the Attorney General to the immigration judges or this Board."); see also Bradvica
> v. INS, 128 F.3d 1009, 1014 (7th Cir. 1997) (noting that the BIA in Medina "held
> that the Attorney General had not delegated jurisdiction to grant relief under
> customary international law or treaty law"); In re A-E-M-, 21 I. & N. Dec. 1157,
> 1162 (BIA 1998) (explaining that "[a]s we held in . . . Medina, neither the Geneva
> Convention nor customary international law creates a potential remedy from
> deportation that can be sought by individual aliens in deportation proceedings
> over and above that provided by the [INA]").

---

n.11 (11th Cir. 2002); Robb v. Bethel School District #403, 308 F.3d 1047, 1051 (9th Cir. 2002)
("Booth strongly suggests that, whatever the statutory context, a plaintiff must exhaust a
mandatory administrative process even if the precise form of relief sought is not available in the
administrative venue").

Beharry, 329 F.3d at 59. See also Bradvica, 128 F.3d at 1014 (noting that the BIA has

jurisdiction to determine whether the INA gives it jurisdiction to consider international law

claims); Galo-Garcia v. INS, 86 F.3d 916, 918 (9th Cir. 1996) ("the IJ (and BIA) lack jurisdiction

over Galo's claim, *unless* jurisdiction is somehow conferred independently by virtue of an

obligation to ascertain and administer customary international law") (emphasis added);

Sanchez-Trujillo v. INS, 801 F.2d 1571, 1581 n.9 (9th Cir. 1986) ("As no claims based upon

customary international law were raised before the IJ or the BIA, this issue is not properly before

us on appeal.")(citations omitted).  That the BIA likely would have held that it could not consider

petitioner's international law claims does not excuse her failure to raise them.  See Booth, 532

U.S. at 734-35, 741 & n. 6 (holding that petitioner failed to exhaust administrative remedies

despite the fact that the administrative process had no power to grant the relief he requested;

"regardless of the relief offered through the administrative procedures . . . we will not read

futility or other exceptions into statutory exhaustion requirements").  In sum, the petitioner's

failure to raise the claims in her amended petition before the administrative agency defeats this

Court's jurisdiction and constitutes a waiver of those claims.

**III.    Should The Court Reach The Merits Of Petitioner's Claims, Despite Her
Failure To Exhaust, The Amended Petition Nonetheless Should Be Denied.**

**A.    The Mere Filing Of A Naturalization Application Does Not
Transform Niver From Alien To "National" Of The United States.**

Niver asserts that she filed two applications for naturalization that evidence her

"permanent allegiance" to the United States and thereby qualify her for national status.  See INA

§ 101 (a)(22); 8 U.S.C. § 1101(a)(22) ("The term 'national of the United States' means (A) a

citizen of the United States, or (B) a person who, though not a citizen of the United States, owes

14

permanent allegiance to the United States"). Niver's argument fails to recognize that the category of noncitizen "national of the United States" is extremely constricted, and the mere ministerial act of filing an application does not automatically result in the conferral of national status.

As the Second Circuit has stated, primarily, an alien becomes a national only at birth, and "thereafter the road lies through naturalization, which leads to becoming a citizen and not merely a 'national.'" Oliver v. INS, 517 F.2d 426, 428 (2d Cir. 1975), cert. denied, 423 U.S. 1056 (1976); accord Cabebe v. Acheson, 183 F.2d 795, 797 (9th Cir. 1950) ("United States nationality depends primarily upon the place of birth....Nationality may also be acquired by naturalization"). As the Second Circuit has further explained:

> The term ["national"] came into use in this country when the United States acquired territories outside its continental limits whose inhabitants were not at first given full political equality with citizens....The term national was used to include these noncitizens in the larger group of persons who belonged to the national community and were not regarded as aliens.

Oliver, 517 F.2d at 428 n.3 (quoting 3 Gordon & Rosenfield, Immigration Law and Procedure, § 11.3b, at 11-8, 11-9 to 11-10) (1975)); see also Rabang v. INS, 35 F.3d 1449, 1452 n.5 (9th Cir. 1994), cert. denied, 515 U.S. 1130 (1995).

The primary requirement of *jus soli* (or right of birthplace) to attain noncitizen national status is based on the concept of sovereignty, with the duty of allegiance owed by the individual to his sovereign reciprocated by the duty of the sovereign to protect the individual. A historical example is found in this country's classification of residents of the Philippines after the islands were ceded to the United States by Spain in 1898. The Philippine population became collectively nationalized, but not naturalized, as a result of this cession. See Barber v. Gonzales,

15

347 U.S. 637, 639 n.1 (1954); see also Boyd v. Nebraska ex rel. Thayer, 143 U.S. 135, 162

(1892) ("Manifestly the nationality of the inhabitants of territory acquired by conquest or cession

becomes that of the government under whose dominion they pass").  Because the United States

exercised sovereignty over the Philippines, "[p]ersons born in the Philippines during [the period

1898 until independence in 1946] were American nationals entitled to the protection of the

United States and conversely owing permanent allegiance to the United States."  Barber, 347

U.S. at 639 n.1.  Thus, "permanent allegiance is a correlative of the concept of sovereignty,"

United States v. Shiroma, 123 F. Supp. 145, 147 (D. Haw. 1954), and for that reason, the phrase

"permanent allegiance" has been "used exclusively, in the case of non-citizens, to describe the

status of inhabitants of United States territories."  Yuen v. IRS, 497 F. Supp. 1023, 1032

(S.D.N.Y. 1980), aff'd 649 F.2d 163 (2d Cir.), cert. denied 454 U.S. 1053 (1981).

Section 101(a)(22) of the INA defines a "national of the United States" as either a citizen,

or a noncitizen who "owes permanent allegiance to the United States."  8 U.S.C. § 1101(a)(22).

In regard to the noncitizen category, it is clear that the requirement of "permanent allegiance"

pertains solely to residents of territories over which American sovereignty extends, and can only

be ascribed to those individuals with national status at birth.  See Igartua De La Rosa v. United

States, 229 F.3d 80, 87 n.12 (1st Cir. 2000) ("The only persons currently holding [the status of

national as defined in 8 U.S.C. § 1101(a)(22)(B)] are residents of American Samoa and Swains

Island"); see also INA § 308, 8 U.S.C. § 1408 ("Nationals but not citizens of the United States at

birth"); INA § 101(a)(29), 8 U.S.C. § 1101(a)(29) (defining the phrase "outlying possessions of

the United States" as used in INA § 308 to mean American Samoa and Swains Island).

The categories of those noncitizens entitled to national status have been established by

16

Congress and are set forth at INA § 308, 8 U.S.C. § 1408. Indeed, the Board of Immigration

Appeals has held that "[t]he acquisition of nationality for a noncitizen national . . . is not

governed by section 101(a)(22); it is governed instead by section 308." Matter of Tuitasi, 15 I. &

N. Dec. 102, 103 (BIA 1974). In Tuitasi, the Board found that a Western Samoan who had been

adopted by an American Samoan family had not acquired United States nationality under INA §

308 because she was not born in American Samoa and neither of her natural parents were

nationals of the United States. Id. The Board held that Tuitasi was not a national of the United

States because "[e]xcept for the acquisition of nationality in conjunction with the acquisition of

citizenship, the [INA] provides no other means by which [Tuitasi] could have acquired United

States nationality." Id. The Board reasoned that "Congress has established rigorous procedures

which govern the acquisition of both lawful permanent resident status and United States

citizenship for aliens. Nationality has attributes akin to each of these." Id. The Board therefore

held that it could not "accept [Tuitasi's] unstated, but underlying, assumption that Congress

would permit an alien to acquire United States nationality merely by asserting an allegiance to

the United States." Id. at 104.

The Board's holding in Tuitasi reflects the fact that the term "permanent allegiance" is

inextricably intertwined with the exercise of sovereignty, and that only citizens of the United

States or those residents of the "outlying possessions" of the United States are nationals. See

Hampton v. Mow Sun Wong, 426 U.S. 88, 90 n.1 (1976) ("Apparently the only persons other

than citizens who owe permanent allegiance to the United States are noncitizen 'nationals.' The

Solicitor General has advised us that the Commission construes the phrase as covering only

natives of American Samoa") (citation omitted); see also D. Levy and Nat'l Immigration Project

of Nat'l Lawyers Guild, *U.S. Citizenship and Naturalization Handbook*, § 3.2 (2001) ("At the present time, there are only two groups that have the status of noncitizen U.S. nationals;" citing inhabitants of American Samoa and Swains Island, and some residents of Northern Mariana Islands who do not elect to become U.S. citizens). Thus, one can become a national only upon a showing of eligibility under the specific criteria outlined by Congress in INA § 308, 8 U.S.C. § 1408. Cf. INS v. Pangilinan, 486 U.S. 875, 884 (1988) ("'An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress'") (quoting United States v. Ginsberg, 243 U.S. 472, 474 (1917)). A holding that INA § 101(a)(22)(B), 8 U.S.C. § 1101(a)(22)(B), includes aliens not covered by INA § 308, 8 U.S.C. § 1408, would afford the courts limitless and undefined power to bestow nationality on aliens, a result Congress certainly did not intend. See Id. at 883-84 ("the power to make someone a citizen of the United States has not been conferred upon the federal courts").

The Ninth Circuit's decision in Hughes v. Ashcroft, 255 F.3d 752 (9th Cir. 2001), holding that, for a person born outside the United States to qualify as a national he or she must, *at a minimum*, demonstrate either birth in a United States territory or an application for United States citizenship, does not help Niver. Id. at 757. In that case, the court found that Hughes did not meet either of the minimal requirements, despite his showing of long-term residence and his assertions of allegiance to the United States. Id. Importantly, the court did not further delineate what additional facts the alien would have to show to establish nationality. Id. ("Because petitioner does not meet either of those minimal requirements, we need not delineate what additional facts (if any) he would have to show."). The Hughes decision did not purport to definitively state the requirements for nationality and thus, it does not support Niver's claim to

18

national status.[17]

Further, to the extent that the court in <u>Hughes</u> construed <u>Oliver v. INS</u>, 517 F.2d 426 (2d Cir. 1975), as holding that Oliver was not a national merely because she had not filed an application for naturalization, the interpretation is erroneous. In <u>Oliver</u>, the Second Circuit Court of Appeals rejected an alien's claim that she owed allegiance to the United States and was thus a national because she had resided exclusively in the United States for twenty years since her early childhood. 517 F.2d at 427. In so holding, the court specifically concluded that "one can satisfy § 101(a)(22)(B) *only* at birth; thereafter the road lies through naturalization which leads to becoming a citizen and not merely a 'national.'" <u>Id</u>. at 427-28 (emphasis added).

In any case, the INA explicitly demonstrates that Congress did not intend for an alien to become a national of the United States merely by filing an application for citizenship. Congress mandated in INA § 318 that no application for naturalization shall be considered by the Attorney General if the alien is in removal proceedings, and that "no person shall be naturalized against whom there is outstanding a final finding of deportability." 8 U.S.C. § 1429. By directing that removal proceedings and final removal orders take precedence over naturalization applications, Congress obviously did not envision that an alien would become a national, and thus be able to avoid deportation, by merely filing an application for naturalization.

In fact, Congress enacted INA § 318 to remedy this very situation. In <u>Shomberg v. United States</u>, 348 U.S. 540 (1955), the Supreme Court considered the language of INA § 318, 8

---

[17] Niver has not acquired and is not eligible for United States citizenship. <u>See</u> <u>Hughes</u>, 255 F.3d at 757 (fact that Poland did not consider petitioner to be a citizen is "evidence of how Polish law treats questions of citizenship and nationality, . . . it can have no bearing on our interpretation of United States law").

U.S.C. § 1429, and found that an alien who had filed his naturalization application before the commencement of deportation proceedings remained subject to these proceedings under the "priority provision" of INA § 318. Id. at 541-42. The Supreme Court noted that before the enactment of section 318, "[t]he practice . . . was for both the deportation and naturalization processes to proceed along together until either petitioner's deportation or naturalization *ipso facto* terminated the possibility of the other occurring," and "there ensued a race between the alien to gain citizenship and the Attorney General to deport him." Id. at 543-44. To remedy this situation, Congress enacted INA § 318 to serve as a bar to final determination of a naturalization petition by an alien against whom there was an outstanding deportation proceeding. Id. at 548.

Obviously, a holding that an alien becomes a national by filing a naturalization application would be directly contrary to INA § 318 and the Supreme Court's holding in Shomberg. Indeed, if Congress believed that the filing of a naturalization application made an alien a national, the proscriptions of § 318 would be superfluous, because such an applicant could not be removed and therefore could not be the subject of a removal proceeding. Moreover, a holding that an alien can become a national by filing a naturalization application would allow any alien (including aliens convicted of aggravated felonies and terrorists) to avoid removal simply by executing and submitting a form. Such a result would be contrary to the intent of Congress, and could produce a torrent of frivolous naturalization applications as thousands (perhaps millions) of aliens hastened to demonstrate their "permanent allegiance" to the United States.

As a final matter, the facts of the instant case serve as an appropriate rejoinder to Niver's claim that she is a national of the United States. While she argues that the mere act of filing a

form with the INS evidences her permanent allegiance, her participation in and eventual

conviction for robbery, larceny as well as narcotics violations that devastate our communities

conclusively belie both the permanence and the allegiance she professes to this country.

**B.    Petitioner's International Law Claims Are Not Reviewable
By This Court And, In Any Event, Are Without Merit.**

As noted above, petitioner claims that her removal would violate various provisions of

international treaties and laws.  More specifically, petitioner complains that her removal would

violate "the guarantees of the International Covenant on Civil and Political Rights (ICCPR)

against arbitrary interference with rights of privacy and family life," Am. Pet. ¶ 5.2,[18] "the

guarantees of the Universal Declaration of Human Rights (UDHR) against arbitrary imposition

of exile," Am. Pet. ¶ 5.3, and the best interests of petitioner's nieces and nephew in violation of

"the Convention on the Rights of the Child (CRC)," Am. Pet. ¶ 5.4.[19]  These claims are not

reviewable by the Court and have no merit.

First, because the ICCPR is not a self-executing treaty this Court does not have

jurisdiction to consider claims arising out of alleged violations of the ICCPR.  The ICCPR was

adopted by the United Nations General Assembly on December 16, 1966, and entered into force

on March 23, 1976.  Statement of Senator Claiborne Pell, Chairman, Senate Foreign Relations

Committee, 138 Cong. Rec. S4781-01, 1992 WL 65154.  The treaty was ratified by the United

States on September 8, 1992, Taveras-Lopez v. Reno, 127 F. Supp. 2d 598, 608 (M.D. Pa. 2000),

but with a number of reservations, understandings and declarations.  138 Cong. Rec. S4781,

---

[18] Petitioner appears to allege a violation of Article 17(1) of the ICCPR, which  provides,
"No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or
correspondence, nor to unlawful attacks on his honour and reputation."

[19] Petitioner additionally claims that her state convictions which form the basis of the
removal order are invalid because her rights under the Vienna Convention on Consular Relations
(VCCR) allegedly were violated.  Am. Pet. ¶ 5.5.  The arguments made in Section III. B. apply
to the VCCR claims, which are also addressed, infra, Section IV.

22

S4783. The most important declaration in this case is "[t]hat the United States declares that the provisions of Articles 1 through 27 of the [ICCPR] are not self-executing." 138 Cong. Rec. S4781, S4783.

For a treaty to confer rights enforceable by private parties it must be self-executing - - i.e., a treaty which requires no legislation to make it operative. Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370 (7th Cir. 1985). If a treaty is not self-executing, "it must be implemented by legislation before it can give rise to a private right of action enforceable in a court of the United States." Jama v. I.N.S., 22 F. Supp. 2d 353, 362 (D.N.J. 1998) (citing Dreyfus v. Von Finck, 534 F.2d 24 (2d Cir. 1976), cert. denied, 429 U.S. 835, (1976), disavowed on other grounds, Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980)).[20]

"Federal courts have subject matter jurisdiction over all civil actions arising under . . . treaties of the United States. 28 U.S.C. § 1331. An action arises under a treaty only when the treaty expressly or by implication provides for a private right of action. The treaty must be self-executing; i.e., it must prescribe[ ] rules by which private rights may be determined." Columbia Marine Services, Inc. v. Reffet Ltd., 861 F.2d 18, 21 (2d Cir. 1988) (citing Dreyfus, 534 F.2d at 30; Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 808 (D.C. Cir. 1984)); see also Igartua De La Rosa v. United States, 32 F.3d 8, 10 n.1 (1st Cir. 1994)(ICCPR not self-executing;

---

[20] "A United States treaty is a contract with another nation which under art. VI, cl. 2 of the Constitution becomes a law of the United States. It may also contain provisions which confer rights upon the citizens of one of the contracting parties which are capable of enforcement as are any other private rights under the law. In general, however, this is not so. Rarely is the relationship between a private claim and a general treaty sufficiently direct so that it may be said to 'arise under' the treaty as required by art. III, s 2, cl. 1 of the Constitution. It is only when a treaty is self-executing, when it prescribes rules by which private rights may be determined, that it may be relied upon for the enforcement of such rights." Dreyfus, 534 F.2d at 29-30.

23

"the ICCPR . . . does not purport to expressly or implicitly create a private right of action for violations of those rights."). Cf. Wang v. Ashcroft, 320 F.3d 130 (2d Cir. 2003) (holding that habeas review of Torture Convention [21] claims is permitted even though treaty is not self-executing because Congress enacted legislation implementing Article 3 of the treaty).

It is clear that Congress specifically dictated that the ICCPR is not self-executing and, as such, no private right of action was created, or exists, for petitioner. In addition, because the UDHR is "not a treaty" and it creates no legal obligations that are enforceable in United States courts.[22] Beharry v. Reno, 183 F. Supp. 2d 584, 596 (E.D.N.Y. 2002), rev'd on other grounds, Beharry v. Ashcroft, 329 F.3d 56, 59 (2d Cir. 2003). And finally, contrary to the Beharry court's statement, the United States is not a party to the CRC, and the CRC in any event "does not have the force of domestic law" in the United States. See id. Accordingly, this Court has no jurisdiction to review petitioner's claims asserted under the ICCPR, UDHR and CRC.

In any event, petitioner's international law and treaty claims are without merit as the provisions of the ICCPR, UDHR and CRC, to the extent they might be relevant, are trumped by

---

[21] The United States is a signatory and ratified party to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture" or "CAT"), 1465 U.N.T.S. 85, G.A. Res. 39/46, 39th Sess., U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984). Article 3 of the Convention provides, in relevant part, that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Torture Convention, Art. 3, S. Treaty Doc. 100-20, 100th Cong., 2d Sess. 20 (May 23, 1988). Congress implemented Article 3 of the Torture Convention in the Foreign Affairs Reform and Restructuring Act of 1988 ("FARRA"). Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231).

[22] The UDHR is not a treaty; rather, it is a nonbinding resolution of the General Assembly of the United Nations. See generally Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 719 (9th Cir. 1992).

the 1996 Congressional enactments eliminating the same type of relief petitioner seeks.

Congress has categorically barred the grant of family hardship relief to lawful permanent resident

aliens like petitioner who have been convicted of an aggravated felony.  See INA § 212(h), 8

U.S.C. § 1182(h); Jankowski-Burczyk v. INS, 291 F.3d 172 (2d Cir. 2002) (rejecting Equal

Protection challenge to categorical bar of § 212(h)); Anti-terrorism and Effective Death Penalty

Act (AEDPA), Pub. L. No. 104-132, § 440(d), 110 Stat. 1214, 1277 (Apr. 24, 1996) (amending

former INA § 212(c), 8 U.S.C. § 1182(c), to bar family hardship relief to any alien convicted of

an aggravated felony); Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA),

Pub. Law. No. 104-208, §§ 304(a)(3), 304(b), 110 Stat. 3009-546 (Sept. 30, 1996) (repealing §

212(c) for *all aliens* and replacing it with "cancellation of removal," a form of discretionary

relief not available to any alien who has been convicted of an aggravated felony).  See INA §

240A(a)(3); 8 U.S.C. § 1229b(a)(3). See also St. Cyr v. INS, 533 U.S. at 295.

"The Supremacy Clause declares the Constitution, federal law, and treaties to be 'the

supreme Law of the Land.'  U.S. Const. art. VI, cl. 2.  It is well-established that under the

Supremacy Clause a self-executing treaty – one that operates of itself without the aid of

legislation – is to be regarded in the courts as equivalent to an act of the legislature."  Cheung v.

U.S., 213 F.3d 82, 94-95 (2d Cir. 2000) (citing Whitney v. Robertson, 124 U.S. 190, 194 (1888)

(to the extent that treaties are self-executing, they 'have the force and effect of a legislative

enactment.')."

Nonetheless, as the Supreme Court held in Breard v. Greene, "although treaties are

recognized by our Constitution as the supreme law of the land, that status is no less true of

provisions of the Constitution itself . . . .  We have held 'that an Act of Congress . . . is on a full

25

parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a

treaty, the statute to the extent of conflict renders the treaty null.'" 523 U.S. 371, 376 (1998)

(quoting Reid v. Covert, 354 U.S. 1, 18 (1957). This rule of law has roots going back two

centuries, to the Head Money Cases, 112 U.S. 580, 598-99 (1884). There the Supreme Court

held that a subsequent statute that conflicted with a prior treaty displaced the conflicting treaty

provisions for the purposes of domestic law. It held that

> A treaty . . . is a law of the land as an act of congress is, whenever its provisions
> prescribe a rule by which the rights of the private citizen or subject may be
> determined. . . . But even in this aspect of the case there is nothing in this law
> which makes it irrepealable or unchangeable. The constitution gives it no
> superiority over an act of congress in this respect, which may be repealed or
> modified by an act of a later date. . . . In short, we are of opinion that, so far as a
> treaty made by the United States with any foreign nation can become the subject
> of judicial cognizance in the courts of this country, it is subject to such acts as
> congress may pass for its enforcement, modification, or repeal.

Edye v. Robertson, 112 U.S. at 598-99 (Head Money Cases); see also Whitney v. Robertson, 124

U.S. at 194. In Committee of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d

929, 936 (D.C. Cir. 1988), the court noted that "[n]o American court has wavered from this view

in the subsequent century."

Well established law makes clear that subsequent Congressional enactments override any

international treaties the United States signs to the extent that the treaty and the subsequent

enactment conflict. See Taveras-Lopez v. Reno, 127 F. Supp. 2d 598, 608-610 (M.D. Pa. 2000)

("the disqualification of aggravated felons from eligibility for a discretionary cancellation of

removal effected by the 1996 Illegal Immigration Reform and Immigrant Responsibility Act,

Pub. L. 104-208, 110, Stat. 3009-594, displaces any obligation assumed by the United States as a

1992 signatory to the ICCPR.") (citing Breard, 523 U.S. at 376); see also United States v.

Pinto-Mejia, 720 F.2d 248, 259 (2d Cir. 1983) (the Court held that "in enacting statutes,

Congress is not bound by an international law . . . [;i]f it chooses to do so, it may legislate

[contrary to] the limits posed by international law."). Thus, petitioner's claim under the ICCPR,

UDHR and CRC must fail.

Although petitioner cites no case law in support of her claims, similar international law

and treaty claims were made by the petitioner, an aggravated felon and long-time legal

permanent resident in Beharry v. Reno, 183 F. Supp. 2d 584, 596 (E.D.N.Y. 2002), *rev'd on*

*other grounds*, Beharry v. Ashcroft, 329 F.3d 56, 59 (2d Cir. 2003). In that case, the district

court (Weinstein, J.) granted Beharry's petition and invoked principles of international law to

interpret INA Section 212(h) to require the INS to provide a hardship waiver hearing under §

212(h) for Beharry. 183 F. Supp. 2d at 603-605. The Beharry court determined that the statutes

mandating the deportation of aggravated felons "would violate treaty obligations and customary

international law" if they were administered according to their literal terms, and it held,

accordingly, that it should "interpret" the statute by making "the minimal changes necessary to

bring the statute into compliance" with what it perceived to be the requirements of international

law. Id. The court limited its ruling in to petitioners like Beharry who had committed his crime

before Congress amended the definition of "aggravated felony" in 1996, but was convicted after

the amendment. Id. at 605.

The Beharry court erred in invoking principles of international law to hold Beharry

eligible for § 212(h) relief. The principle purportedly applied by the Beharry court -- that

statutory interpretation should be informed by international law, id. at 604, has no application to

that or this case because the plain language of the INA unambiguously precludes family hardship

relief for aggravated felons like Beharry and the petitioner herein.

Indeed, the Beharry court recognized, correctly, that no source of international law supplies direct legal authority for compelling the INS to afford an alien relief from deportation. As explained above, and noted in Beharry, the ICCPR is a non-self-executing treaty that lacks the force of law in United States courts. Id. at 595; see Beazley v. Johnson, 242 F.3d 248, 267 (5th Cir. 2001) (explaining that "'the courts may not enforce'" the provisions of the ICCPR because the treaty is not self-executing, and collecting cases). As the Beharry court also acknowledged, the UDHR is "not a treaty" and it creates no legal obligations that are enforceable in United States courts.[23] Beharry, 183 F. Supp. 2d at 596. And finally, contrary to the Beharry court's statement, the United States is not a party to the CRC, and the CRC in any event "does not have the force of domestic law" in the United States. See id. The Beharry court determined, however, that international law was relevant to that case as a tool of statutory construction. Id. at 593, 603-05. In accordance with this view, the court characterized its decision as one based upon statutory interpretation; it stated that in making a § 212(h) hearing available to Beharry it was merely "interpret[ing] the statute in a way which does not violate international law," id. at 604, or, put another way, construing the statute "into compliance with international law." Id. at 605.

The Beharry court's view that it was engaged in statutory construction was mistaken. Statutory construction begins with the language of the statute, and "where the statutory language provides a clear answer, it ends there as well." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999). As the Supreme Court has explained, the "first canon" of statutory construction is

---

[23]  As noted above, the UDHR is not a treaty; rather, it is a nonbinding resolution of the General Assembly of the United Nations.

28

that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." <u>Connecticut Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1993). Indeed, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" <u>Id</u>. The district court in <u>Beharry</u> apparently understood that statutory ambiguity is a precondition for using tools of statutory interpretation. As the Supreme Court has held, however, Section 212(h) is clear and unambiguous – its plain terms provide "for automatic denial of discretionary waiver from exclusion" in aggravated felony cases. <u>St. Cyr</u>, 533 U.S. at 319, n.43 (explaining Section 212(h)).[24] <u>See also Jankowski-Burczyk</u>, 291 F.3d 172. Under these circumstances, there is no room for statutory interpretation, whether by reference to international law or to any other canon of statutory construction. Indeed, the <u>Beharry</u> court was mistaken when it held that it was "interpreting" or "construing" Section 212(h) by applying the statute inconsistently with its plain terms. When the <u>Beharry</u> court created an exception to the automatic denial of relief to aggravated felons, it did not 'interpret' Section 212(h). Instead, the court rewrote the statute. The <u>Beharry</u> court itself tacitly acknowledged that it was altering the terms of the law as it undertook to "make the minimal changes necessary to bring the statute into compliance" with its view of international mandates. Making "changes" to a statute goes beyond the judicial task of statutory interpretation. <u>See United States v. Oakland Cannabis Buyers'</u>

---

[24] Nothing in the language of Section 212(h) itself provides any conceivable basis for creating an exception for felons who committed their crimes before Congress amended the INA in 1996, but who pled guilty after the amendments had been enacted. As the Second Circuit has pointed out in a similar context, although non-citizens may well consider the immigration consequences of deciding to enter a guilty plea in a criminal case, it would "'border on the absurd to argue'" that an alien "would have decided not to commit a crime if he had known that he not only could be imprisoned, but also could face deportation without the availability of a discretionary waiver of deportation." <u>Domond v. INS</u>, 244 F.3d 81, 86 (2d Cir. 2001).

Cooperative, 532 U.S. 483, 497 (2001) (explaining that a court "cannot 'ignore the judgment of Congress, deliberately expressed in legislation'").

The Beharry court accordingly erred when it invoked international law principles to justify its grant of a hearing for Beharry under Section 212(h) and the court's analysis does not assist petitioner in this case.

**IV.    Petitioner Cannot Challenge Her State Convictions In This Habeas Proceeding.**

Petitioner further claims that her state criminal convictions are invalid due to (1) the alleged failure of arresting officers to notify the Consulate of Poland in violation of the Vienna Convention on Consular Relations[25] and (2) her criminal defense counsel's ineffective assistance. These claims also are unavailing because "assertions of error in criminal proceedings must first be raised in state court in order to form the basis for relief in habeas." Breard v. Greene, 523 U.S. 371, 375 (1998). See also Wainwright v. Sykes, 433 U.S. 72 (1977). Petitioner's procedural default in not asserting a Vienna Convention claim in state court precludes her from raising a claim of violation of her rights, if any, under the Vienna Convention on federal habeas review. Breard, 523 U.S. at 375-76.[26]

---

[25] Article 36(1)(b) of the Vienna Convention provides, among other things, that when a foreign national is arrested, "the competent authorities of the receiving State . . . shall, without delay, inform the consular post of the sending State . . . if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner." After the consular official is notified, he or she may visit the national, help to provide legal counsel, or arrange a for a visit with the national's family. U.S. v. Erdil, 230 F. Supp. 2d 292, 297 (E.D.N.Y. 2002) (quoting Vienna Convention, art. 36(1)(c)).

[26] Even if petitioner had not defaulted procedurally on her claims under the Vienna Convention, the claims fail. See United States v. De La Pava, 268 F.3d 157, 164-165 (2d Cir. 2001) (declining to dismiss indictment on basis of Vienna Convention violation); and United States v. Jimenez-Nava, 243 F.3d 192 (5th Cir. 2001) (declining to suppress evidence on basis of

Further, although Niver has represented that she is challenging her state convictions via state collateral proceedings, this does not change the finality of the convictions for removal purposes.  See Montilla v. INS, 926 F.2d 162, 164 (2d Cir.1991) ("conviction is considered final and a basis for deportation when appellate review of the judgment--not including collateral attacks--has become final.").  See also Johnson v. INS, No. 3:03CV96, 2003 WL 151381, *2 (D. Conn. Jan. 21, 2003) (Arterton, J.)(discussing finality of conviction for removal purposes even if under collateral attack); Plummer v. Ashcroft, 258 F. Supp. 2d 43, 45 (D. Conn. 2003) (same).

Moreover, an immigration habeas petition under 28 U.S.C. § 2241 is not the appropriate vehicle for contesting an underlying state criminal conviction.  See Johnson, 2003 WL 151381 at *2 (denying immigration habeas petition; holding alien cannot use § 2241 to collaterally challenge state conviction on which his removal order is based); Plummer, 258 F. Supp. 2d at 45 ("this § 2241 petition cannot be used to challenge [petitioner's] underlying state conviction); Pietre v. Bintz, 2003 WL 1562273 (N.D.N.Y. Mar. 25, 2003) (A habeas petition brought pursuant to 28 U.S.C. Sec. 2241 cannot be used to challenge the underlying state conviction). See also Gomez-Deleon v. INS, No. 3:01cv1825, 2002 WL 1608331, *5-6 (D. Conn. 2002) (Droney, J.) ("this Court is not empowered to look behind a prisoner's conviction 'to review the factual innocence of a defendant who voluntarily plead guilty to the crime for which the defendant is being deported.'") (citing Lennon v. INS, 527 F.2d 187, 194 n. 16 (2d Cir. 1975) (other citations omitted)).  Accordingly, the claims should be dismissed for lack of jurisdiction.

**V.    The Order Staying Petitioner's Removal Should be Vacated.**

---

Vienna Convention violation).

On March 6, 2003, the Court (Thompson, J.) entered an Order granting petitioner's request for a stay of removal. The stay order should now be vacated because, as explained above, there is virtually no possibility that petitioner will succeed on the merits of her claims and she is ineligible for any form of statutory discretionary relief from removal. See Mohammed v. Reno, 309 F.3d 95, 100, 103 (2d Cir. 2002) (holding that heightened standard under INA § 242(f)(2), codified at 8 U.S.C. § 1252(f)(2), does not apply to stays pending appeal of denial of alien's habeas petition, but vacating District Court's stay order under traditional injunctive relief analysis where petitioner had virtually no chance of success on the merits of his claim for 212(c) relief); see also Kenyeres v. Ashcroft, - - - S. Ct. - - -, 2003 WL 1442464, *3 (March 21, 2003) (Kennedy, J.) (Vacating stay granted by Eleventh Circuit Court of Appeals and denying stay application, in a case where alien petitioned for direct review, because "applicant is unable to establish a reasonable likelihood that a reviewing court will be compelled to disagree with the decision of the BIA [denying asylum application]" and not deciding the issue of whether heightened stay standard under 8 U.S.C. § 1252(f)(2) applies because [a]pplicant is unlikely to prevail in his request for a stay under either of the standards adopted by the Courts of Appeals.").

## CONCLUSION

For the foregoing reasons, the respondent respectfully requests that the amended petition

for writ of habeas corpus be dismissed for lack of jurisdiction or, alternatively, denied on the

merits, and that the Court vacate the Order staying petitioner's removal.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

BY: MARK G. CALIFANO
ASSISTANT UNITED STATES ATTORNEY

FOR: LISA E. PERKINS
ASSISTANT UNITED STATES ATTORNEY
450 MAIN STREET, ROOM 328
HARTFORD, CT  06103
(860) 947-1101
FEDERAL BAR NO. ct23164

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the within and foregoing has been mailed, postage prepaid,

this 21st day of November 2003, to:

David J. Wenc, Esq.
Waterside Office Park
44 Main Street
P.O. Box 306
Windsor Locks, CT 06096

BY: MARK O. CALIFANO
ASSISTANT UNITED STATES ATTORNEY
FOR: LISA E. PERKINS
ASSISTANT UNITED STATES ATTORNEY