1

1 | NO. CR-99 98546        )  SUPERIOR COURT OF CONNECTICUT

2 | STATE OF CONNECTICUT   )  JUDICIAL DISTRICT OF LITCHFIELD

3 |                        )  (AT LITCHFIELD)

4 |              -vs-      )

5 | ALICJA NIVER,          )

6 |           Defendant. ) OCTOBER 5, 1999

7

8

9

10  B E F O R E:

11          THE HONORABLE ALEXANDRIA DIPENTIMA,
                                        JUDGE
12

13

14  A P P E A R A N C E S:

15

ON BEHALF OF THE STATE OF CONNECTICUT:
16        DAVID SHEPACK, ESQ.
          SENIOR ASSISTANT STATE'S ATTORNEY
17        63 WEST STREET
          LITCHFIELD, CONNECTICUT
18

19  ON BEHALF OF THE DEFENDANT:
          CHRISTOPHER COSGROVE, ESQ.
20        PUBLIC DEFENDER
          63 WEST STREET
21        LITCHFIELD, CONNECTICUT

22

23

24

25

26

27

2

1    10-5-99    A F T E R N O O N   S E S S I O N.

2              MR. SHEPACK:  Good afternoon, your Honor.

3              THE COURT:  Good afternoon.

4              MR. SHEPACK:  My understanding is that we're

5         prepared to proceed on the Alicja Niver matter, if she

6         could be brought upstairs, if your Honor please.

7              THE COURT:  Okay.  Thank you.

8              Do you have a Substitute Information?

9              MR. COSGROVE:  This is Mrs. Niver.

10             THE COURT:  Good afternoon, Ms. Niver.

11             THE DEFENDANT:  Good afternoon.

12             MR. COSGROVE:  Your Honor, earlier -- in an

13        earlier occasion, we entered not guilty pleas.  May the

14        prior pleas be vacated in this file?

15             THE COURT:  Yes.

16             MR. SHEPACK:  And the state has filed a Substitute

17        Information in two counts, dated today, charging Robbery

18        in the Third Degree, and Larceny in the Third Degree, if

19        the accused could be put to plea?

20             THE COURT:  Is your client prepared to be put to

21        plea, Attorney Cosgrove?

22             MR. COSGROVE:  She is, your Honor.

23             THE COURT:  Mr. Stearns?

24             THE CLERK:  Alicja Niver, in docket CV 99-98546,

25        you are charged in Substitute Information with Robbery

26        in the Third Degree, in violation of Connecticut General

27        Statutes section 53a-136.  To this charge, how do you

3

1   plead?

2          THE DEFENDANT:  I plead guilty.

3          THE CLERK:  And in the Second Count, you are

4   charged in Substitute Information with Larceny in the

5   Third Degree, in violation of Connecticut General

6   Statutes section 53a-124.  To this charge, how do you

7   plead?

8          THE DEFENDANT:  I plead guilty.

9          MR. SHEPACK:  Your Honor, had there been a trial

10  in this matter, the state was prepared to establish that

11  on June 3rd of 1999, Ms. Niver entered a business known

12  as Coffee House Plus, on South Main Street, in

13  Torrington.  Once inside, she indicated to the

14  individuals inside the store that she had a gun, and

15  that she wanted money.  She obtained money from the cash

16  register in the amount of $117, and she also obtained

17  some money from a patron.  She also ended up with the

18  car keys from a patron in the place, and ended up taking

19  the car and fleeing the scene.  The car, your Honor, was

20  valued at more than the statutory amount required for

21  Larceny in the Third Degree, your Honor.

22         THE COURT:  Five thousand dollars, less than

23  $5,000?

24         MR. SHEPACK:  Less than $5,000, yes.  It was a

25  1993 Olds Regency motor vehicle.

26         The state will be recommending at the time of

27  sentence a sentence of ten years, execution suspended

4

1  after five years.  The defendant has reserved the right

2  to argue for a lesser sentence; terms and conditions of

3  probation are left to the sentencing court.

4       The state will be seeking restitution, and also no

5  contact with the victims, or this particular place of

6  business, as conditions of probation.

7       I understand that the defense intends to challenge

8  the restitution as part of their argument on a right to

9  argue for less, and we're aware of that.

10       THE COURT:  The top part of that was ten --

11       MR. SHEPACK:  Ten suspended after five, to argue

12  for less; terms and conditions of probation left to the

13  Court; obviously contemplating a PSI.

14       THE COURT:  And in terms of the robbery charge,

15  Attorney Shepack, which is Robbery in the Third Degree

16  under 53a-136, which is essentially robbery under the

17  53a-133, I assume, it's subsection (2), which is to

18  compel the owner of property to deliver up the

19  property?

20       MR. SHEPACK:  Yes, your Honor.  She went in,

21  represented she had a gun, demanded the money so --

22       THE COURT:  Okay.  Attorney Cosgrove, that is your

23  understanding of the agreement?

24       MR. COSGROVE:  Yes, it is, your Honor.

25       THE COURT:  Have you had the opportunity to

26  discuss it with Ms. Niver?

27       MR. COSGROVE:  I have, your Honor.

5

1    THE COURT:  Ms. Niver, before I accept your guilty

2    pleas, I'm going to ask you a few questions to make sure

3    you understand the consequences of your plea.

4    THE DEFENDANT:  Yes, sir.

5    THE COURT:  How old are you, Ms. Niver?

6    THE DEFENDANT:  I am 40 years old.

7    THE COURT:  And how far did you go in school?

8    THE DEFENDANT:  Sixteen years.

9    THE COURT:  So you graduated from high school?

10   THE DEFENDANT:  Yes.  I got high school, and I got

11   two years of college in my country and --

12   THE COURT:  What's your country, ma'am?

13   THE DEFENDANT:  Poland.

14   THE COURT:  And before you've been incarcerated,

15   have you had a job?  Have you been employed in this

16   country.

17   THE DEFENDANT:  Oh, yes.

18   THE COURT:  What kind of job?

19   THE DEFENDANT:  I was working in a bank for a lot

20   of years, and then when I got trouble with my addiction

21   with the drugs, I lost my job, and then I was

22   waitressing and working as a --

23   THE COURT:  Are you married?

24   THE DEFENDANT:  Yes.

25   THE COURT:  Do you have any children?

26   THE DEFENDANT:  No, I don't.

27   THE COURT:  Right now, Ms. Niver, are you under

6

1    the influence of any alcohol, or drugs, or medicine

2    today?

3            THE DEFENDANT:  No, I don't, but I'm taking

4    medications, but I didn't take any today because they

5    don't give us when we come into --

6            THE COURT:  They don't give you --

7            THE DEFENDANT:  They don't give us when we come

8    into court.

9            THE COURT:  So that you -- there is nothing that

10   you've taken that would affect your ability to

11   understand my questions?

12           THE DEFENDANT:  Yes.

13           THE COURT:  And to answer my questions?

14           THE DEFENDANT:  Yes.

15           THE COURT:  And Ms. Niver, have you had enough

16   time to talk to Attorney Cosgrove before you decided to

17   enter these guilty pleas?

18           THE DEFENDANT:  Yes, we did.

19           THE COURT:  And are you satisfied that Attorney

20   Cosgrove has answered the questions you have had?

21           THE DEFENDANT:  Yes, I am.

22           THE COURT:  So you are satisfied with his advice

23   to you?

24           THE DEFENDANT:  Yes.  Mr. Cosgrove is very -- I'm

25   very satisfied with his services, very nice.

26           THE COURT:  And has he explained to you that you

27   are giving up certain rights by pleading guilty?

7

1        THE DEFENDANT:  Yes, he did.

2        THE COURT:  And I'm going to go over those rights

3    to make sure you understand that you are giving up your

4    right to try this case before a judge or a jury with the

5    assistance of Attorney Cosgrove or another lawyer.  You

6    are giving up your right to remain silent, your right to

7    continue to plead not guilty.  You're giving up your

8    right to make the state prove its case against you

9    beyond a reasonable doubt.  You are giving up your right

10   to cross-examine witnesses against you and to put on

11   your own defense.  You are giving up all these rights.

12   Do you understand that?

13        THE DEFENDANT:  Yes, I do.

14        THE COURT:  Are you pleading guilty voluntarily

15   and of your own free will?

16        THE DEFENDANT:  Voluntarily.

17        THE COURT:  Is this your own decision?

18        THE DEFENDANT:  Yes.

19        THE COURT:  Has anyone forced you or threatened

20   you in any way to make you plead guilty today?

21        THE DEFENDANT:  No.

22        THE COURT:  And have you discussed with Attorney

23   Cosgrove the two offenses which you have pled guilty to,

24   what the state must prove in order to show that you are

25   guilty of Robbery in the Third Degree, and Larceny in

26   the Third Degree?

27        THE DEFENDANT:  Yes, I did.

1    THE COURT:  I'm going to go over those statutory

2    offenses to make sure that you understand the elements

3    of those offenses.  You are guilty of Robbery in the

4    Third Degree when in the course of committing a larceny,

5    which we will explain later, you use or threaten the

6    immediate use of physical force upon another person for

7    the purpose of compelling the owner of such property or

8    another person to deliver up the property, or to engage

9    in other conduct which aids in the commission of a

10   larceny.  That is Robbery in the Third Degree.

11        THE DEFENDANT:  Okay.

12        THE COURT:  You have also pled guilty to Larceny

13   in the Third Degree.  And you are guilty of Larceny in

14   the Third Degree when with intent to deprive another of

15   the property or to appropriate the same to yourself or a

16   third person, you wrongfully take, obtain, or withhold

17   such property from an owner, and in this case the

18   property consisted of a motor vehicle, the value of

19   which was $5,000 or less.  You understand that that is

20   the statutory offense which you pled guilty to?

21        THE DEFENDANT:  Yes.

22        THE COURT:  Okay.  Have you also discussed with

23   Attorney Cosgrove the evidence the state claims it has

24   to prove that you committed these offenses?

25        THE DEFENDANT:  Yes, I did.

26        THE COURT:  Was Attorney Shepack, the state's

27   attorney's statement of the facts essentially accurate?

1    Is that essentially what happened, what the attorney

2    explained?

3            THE DEFENDANT:  Yes, it is, happened.  I don't

4    actually remember everything, because I was under the

5    influence but -- under the influence of drugs, but most

6    likely that is what happened.

7            THE COURT:  And have you discussed that with

8    Attorney Cosgrove?

9            THE DEFENDANT:  Yes.

10           THE COURT:  And you have no reason to believe that

11   it is not an accurate --

12           THE DEFENDANT:  No.

13           THE COURT:  -- account?

14           Are you on probation or parole, at this time?

15           THE DEFENDANT:  No, no.

16           THE COURT:  You understand if I accept your guilty

17   plea no trial will take place, and that once I accept

18   your plea you cannot withdraw it without my permission,

19   without the Court's permission?  You understand that?

20           THE DEFENDANT:  Yes, yes.

21           THE COURT:  And in this case, Mrs. Niver, there

22   has been an agreement that the Court enter a sentence of

23   ten years suspended after five years, reserving to you

24   and your counsel the right to argue for a lesser

25   sentence at the time of sentencing.

26           THE DEFENDANT:  Yes.

27           THE COURT:  And you should understand that if I

1    decide after reading the Pre-sentence Investigation

2    Report that will be ordered, and listening to counsel at

3    the time of sentencing, if I decide that that sentence

4    is not an appropriate sentence, and that you ought to be

5    in jail longer, then I would allow you to withdraw your

6    plea, and in that instance --

7            THE DEFENDANT:  Yes.

8            THE COURT:  -- you understand that?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Okay.  You should understand, Ms.

11   Niver, that both of these offenses are Class D felonies,

12   and that means that the maximum penalty the Court could

13   impose for each of those offenses would be five years in

14   jail.  The Court could impose those consecutively, so

15   that you -- the maximum penalty the Court could impose

16   would be a ten-year jail sentence as a result of your

17   pleas, plus a fine of $5,000 for each offense.  So you

18   could have a fine of $10,000 imposed, that is the

19   maximum I could impose.  Do you understand that under

20   the statute that is the most I could impose if there was

21   no agreement, that is the maximum I could impose?

22           THE DEFENDANT:  Fine.  I'm very confused --

23           THE COURT:  Under -- I'm just explaining to you

24   what the maximum penalty is under the statute.  I

25   understand there is an agreement otherwise, but I want

26   to make sure you understand what the maximum penalty is

27   under the statute.  Do you understand that $10,000 fine,

1    ten years in jail?

2        THE DEFENDANT:  Okay.  Yes.

3        THE COURT:  Ms. Niver, if you are not a citizen of

4    the United States, you should understand that conviction

5    of these offenses could result in deportation, exclusion

6    from admission to the United States, and/or denial of

7    naturalization pursuant to the laws of the United

8    States.

9        THE DEFENDANT:  Yes.

10        THE COURT:  Do you understand that, Ms. Niver?

11        THE DEFENDANT:  Yes.

12        THE COURT:  Have you discussed that with your

13    attorney?

14        THE DEFENDANT:  Yes.

15        THE COURT:  Ms. Niver, have you understood my

16    questions to you?

17        THE DEFENDANT:  Yes, I did, your Honor.

18        THE COURT:  Do you have any questions?

19        THE DEFENDANT:  No.  I understand.

20        THE COURT:  You understand that the agreement here

21    is for me to have the -- order a Pre-sentence

22    Investigation Report, so that I can review that prior to

23    sentencing, and at the time of sentencing, the state is

24    going to argue that I impose a sentence of ten years

25    suspended after five years in jail, with a period of

26    probation, including restitution, and that you and your

27    lawyer are going to have the opportunity to persuade me

1    for a lesser sentence, less than ten after five.  But if

2    I choose to impose this sentence that the state is

3    requesting, that is not grounds for you to withdraw your

4    plea?  Do you understand that the Court could do that as

5    a result of this agreement?

6          THE DEFENDANT:  Yes, I understand.

7          THE COURT:  Okay.

8          THE DEFENDANT:  Yes, I understand.

9          THE COURT:  Okay.  Attorney Cosgrove, do you have

10    any reason to believe Ms. Niver has not understood my

11    questions, that her plea is not voluntary, and should

12    not be accepted?

13          MR. COSGROVE:  I do not, your Honor.

14          THE COURT:  Attorney Shepack?

15          MR. SHEPACK:  No, your Honor.

16          THE COURT:  And did I correctly recite the

17    agreement as it is, at this point?

18          MR. SHEPACK:  Yes, your Honor.

19          THE COURT:  Understanding that the restitution

20    issue is one that will be addressed, and the right to

21    argue for less?

22          MR. COSGROVE:  Yes, your Honor.

23          THE COURT:  That is one of the conditions that you

24    are going to address.

25          MR. COSGROVE:  Yes, but the term and conditions

26    would be up to the Court.

27          THE COURT:  Yes, so that I could impose the

1    condition of restitution, and that would not be outside

2    of the agreement.

3            MR. COSGROVE:  That is correct, your Honor.

4            THE COURT:  All right.  The Court finds that the

5    defendant's pleas are voluntary, they are made with

6    understanding, with the assistance of competent counsel,

7    there is a factual basis for each plea.  The pleas are

8    accepted.  A finding of guilty may enter under each

9    count.  Court will order that a Pre-sentence

10   Investigation Report be prepared, will continue this

11   case for seven weeks for sentencing.

12           THE CLERK:  Actually eight weeks.

13           THE COURT:  Actually eight weeks for this

14   instance.

15           THE CLERK:  Your Honor, December 3rd, Friday,

16   December 3rd.

17           MR. COSGROVE:  May I have a moment, your Honor?

18           THE COURT:  Yes.

19           MR. COSGROVE:  Your Honor, I would ask the Court

20   to order an AIC assessment be done of Mrs. Niver to be

21   included as part of the pre-sentence investigation.

22           THE COURT:  Any objection to that?

23           MR. SHEPACK:  Well, I object to the relief

24   requested, but I mean it's a right to argue, so

25   Mr. Cosgrove can ask for anything within that range.

26           THE COURT:  I also would like the probation

27   officer to indicate whether he or she recommends that

14

1  such a plan would be appropriate, not that I will follow

2  that, but I would like to know their opinion.  So, I

3  will order that, but also ask the officer to prepare a

4  recommendation, as well.

5        MR. COSGROVE:  Thank you, your Honor.

6        THE COURT:   Attorney Cosgrove, does there need to

7  be anything on the mit in this case?

8        MR. COSGROVE:  I don't think so.  I think there

9  has already been some communication with the

10  correctional facility.

11        THE COURT:  Okay.  All right.  We'll see you on

12  December 3rd, Mrs. Niver.

13        THE DEFENDANT:  Okay.  Thank you.

14        (Hearing concluded.)

15

16

17

18

19

20

21

22

23

24

25

26

27

1
2
3
4
5
6                    C E R T I F I C A T I O N
7
8        This is to certify that I, Barbara J. Miller, a Notary
9    Public and Court Reporter in and for the State of Connecticut
10   certify that the foregoing is a true and accurate transcript
11   of my stenographic notes, taken with respect to the
12   above-entitled matter, heard at the Litchfield Superior Court
13   on October 5, 1999.
14       Dated at Litchfield, Connecticut, on this 8th day of
15   May, 1999.
16
17
18
19   _____
20                            Barbara J. Miller, RPR-CSR
21
22
23
24
25
26
27

1

1  NO. CR-99 98546        )  SUPERIOR COURT OF CONNECTICUT

2  STATE OF CONNECTICUT   )  JUDICIAL DISTRICT OF LITCHFIELD

3                         )   (AT LITCHFIELD)

4            -vs-         )

5  ALICJA NIVER,          )

6          Defendant. )  DECEMBER 3, 1999

7

8

9

10  B E F O R E:

11           THE HONORABLE ALEXANDRIA DIPENTIMA,
                                            JUDGE

12

13

14  A P P E A R A N C E S:

15  ON BEHALF OF THE STATE OF CONNECTICUT:
        DAVID SHEPACK, ESQ.
16      STATE'S ATTORNEY
        63 WEST STREET
17      LITCHFIELD, CONNECTICUT

18
    ON BEHALF OF THE DEFENDANT:
19      CHRISTOPHER COSGROVE, ESQ.
        PUBLIC DEFENDER
20      63 WEST STREET
        LITCHFIELD, CONNECTICUT

21

22

23

24

25

26

27

1        MR. SHEPACK:  Good afternoon, your Honor.

2        THE COURT:    Good afternoon.

3        MR. COSGROVE:  Good afternoon, your Honor.

4        THE COURT:  Good afternoon, Ms. Niver.

5        MR. SHEPACK:  This is the matter of State of

6 Connecticut versus Alicja Niver, docket number

7 99-98546.  And as will appear from the record, your

8 Honor, Ms. Niver appeared in this court on October 5th

9 of 1999, and at that time entered pleas of guilty to a

10 two-count Substitute Information alleging one count of

11 Robbery in the Third Degree, one count of Larceny in the

12 Third Degree.  Those pleas were canvassed, found to be

13 voluntarily entered; factual basis; with effective

14 assistance of counsel.

15        At the time of the plea, your Honor, the state

16 indicated that it would be recommending a total

17 effective sentence of ten years, execution suspended

18 after five years, reserving to the defendant the right

19 to argue for a lesser sentence; term and conditions of

20 probation left to the sentencing court.

21        The state did indicate that it would be seeking

22 restitution, and no contact with the victim or the

23 locale of the offense.  Pre-sentence investigation with

24 an AIP assessment was ordered for December 3rd, 1999.

25 At that time, the Court had asked that probation set

26 forth its opinion as to whether or not the AIP was in

27 their judgment appropriate.

3

1    Pre-sentence investigation was prepared.  I note

2    that although an alternative incarceration plan is

3    appended to the PSI, my notes, specifically on page 7,

4    this officer indicates in the last sentence that they,

5    the probation report author, did not believe the

6    alternative incarceration plan should be implemented

7    because -- that appears on page 7 -- this robbery, your

8    Honor, occurred at a coffee-type restaurant, coffee and

9    pastry-type restaurant, fairly busy concern in

10    Torrington, located at 242 South Main Street.  The

11    perpetrator entered, represented that she had a gun, to

12    the alarm and significant psychological fright to a

13    number of individuals:  The salesperson or store clerk,

14    and another woman who came into the restaurant as a

15    customer.  And I know significantly the woman who came

16    in as a customer, when the clerk kind of gave her a

17    signal with the eyes to leave, she realized it was a

18    robbery, fled.  In her fright, she falls down outside

19    and ends up cutting her leg.  And I have been informed

20    by Ms. Ferris she had to have stitches to repair that

21    cut.  I'm not suggesting it was a life-threatening

22    injury, or even a permanently disabling injury, but I do

23    make the point that, you know, this did cause her such

24    fear that she fled, she fell down, she got hurt, and as

25    fortune would have it, something more serious didn't

26    occur.  It's entirely plausible that she could have

27    tried to run across the street and been struck by a

1   vehicle, or any number of unpleasant alternatives.

2        The defendant took, in the context of the robbery,

3   approximately $117, and did take the clerk's Oldsmobile

4   automobile, a 1993.  That vehicle, according to the

5   damage estimates submitted by the victim, invoiced out

6   at $4,634 on one invoice, and the actual -- the other

7   invoice was $4,277; which is the figure that appears in

8   the PSI.  In fact, we have two pages of estimates, and

9   as I read it, the aggregate total of 46 34 99.

10        I reviewed the PSI.  Obviously, the defendant has

11  some mental health issues; obviously, the defendant has

12  had some difficulties in her life; obviously, the

13  defendant has a drug history; and obviously, the

14  defendant has a significant, I submit, prior criminal

15  record.

16        I make two observations.  I think this case

17  underscores just what a scourge the sale of narcotics is

18  in our community, because this is one of those

19  concentric rings that emanate from that behavior.  That

20  is not to excuse Ms. Niver, but it is just to highlight

21  the problems that emanate from the sale-of-drug cases.

22        THE COURT:  I think the words of the defendant are

23  on page 3, are particularly pertinent to that, that

24  comment you are making, Attorney Shepack.

25        MR. SHEPACK:  I understand.  I agree.  I mean that

26  is, I suppose, that is an argument for another case on

27  another day but it's, you know, we get this claim, I get

1    this claim all the time, that sale of narcotics isn't

2    violent.  And this is a case in point that it is,

3    because this is what it causes.  But be that as it may,

4    this woman did go in, she did do the robbery, she scared

5    the bejesus out of the two ladies that were there, and

6    I'll concede she has got problems.  But I won't concede,

7    I don't deem the argument appropriate that those

8    problems should relieve her of having a split sentence

9    with a period of imprisonment.  It seems to me this kind

10   of conduct, even under these circumstances, calls out

11   for a period of imprisonment.  So I would urge the Court

12   to impose a split sentence, a period of imprisonment,

13   and frankly, I think the five-year period of

14   imprisonment the state recommends is appropriate.

15        This is a serious offense.  She caught a break on

16   the Substitute Information, the state reduced -- this is

17   a stone-cold Robbery Two.  And by subbing it down to

18   Robbery Three, it has been a significant benefit to her

19   criminal history, because it's a stone-cold Robbery

20   Two.  There are no defenses to it.  It was really, as

21   part of negotiating process, state agreed to reduce the

22   charge, but this is a -- that was awarded up front in

23   exchange for a plea.

24        Seems to me that the five-year imprisonment

25   portion of this argument is fair.  It's appropriate.

26   It's consistent with the conduct.  We just can't, as a

27   community, allow this sort of behavior to go on.

1    Conditions of probation, obviously, restitution;

2    obviously, no contact with the location of the victim;

3    obviously, psychiatric or psychological treatment as

4    required; obviously, drug treatment, drug treatment as

5    required.  All of these things would benefit the accused

6    as well as the community, so this is really -- state's

7    position on this.

8         I know Ms. Ferris had received some communication

9    from the store clerk and I will -- she wishes to address

10   that.

11        THE COURT:  Thank you, Attorney Shepack.

12        Good afternoon.

13        MS. FERRIS:  With your permission, the victim,

14   Theresa McLellan, submitted a letter to me and asked me

15   to read it to the Court.

16        THE COURT:  All right.

17        MS. FERRIS:  "To whom it may concern:  I am

18   writing in reference to the case of Alicja Niver.  In

19   June of this year, she came into the coffee shop where I

20   was employed and had been employed there for 16 years,

21   without any problems whatsoever.

22        She robbed me of the money in the cash register,

23   and told me to give her the keys to my car or she would

24   kill me, so I did, fearing for my life.  She also robbed

25   one other customer; chased another customer on the road

26   with my car.  She caused a female customer who was

27   trying to run out of the store to fall down and get hurt

1    resulting in going to the hospital for stitches.

2    This whole ordeal has been very traumatic for me.

3    I have had nightmares.  I was really scared.  I had to

4    call my doctor after it happened to get medication so I

5    could sleep at night.  I felt so violated.

6    Alicja needs to serve her time and should seek

7    some kind of rehabilitation after her time served.

8    Also, I don't want any contact with her whatsoever, as I

9    am fearful of her.  She has caused a lot of emotional

10   stress for me.

11   She caused $4,500 worth of damage to my car, which

12   I was without for two weeks for repairs.  For a very

13   long time I was fearful of even going to work, always

14   afraid it would happen again.

15   I am writing this letter to the Court instead of

16   being there because I feel it is still too emotional for

17   me to have to see her and go through the same feelings

18   again that I'm trying to forget about.

19   Please don't give her the opportunity to do this

20   again to someone else.  I wouldn't want anyone else to

21   have to go through what I did.

22   Sincerely, Theresa McLellan. "

23   THE COURT:  Would you give me that number again in

24   terms of what her claim is?

25   MS. FERRIS:  It says 4,500 in the --

26   THE COURT:  Okay.

27   MS. FERRIS:  I know she did have insurance, your

8

1    Honor.  It was Allstate.  There was some significant

2    problems with having them pay for the damage.

3            THE COURT:  Thank you, Ms. Ferris.

4            Anything else, Attorney Shepack?

5        MR. SHEPACK:  No, your Honor.

6            THE COURT:  Attorney Cosgrove, have you had the

7    chance to review this with your client, this

8    pre-sentence investigation report?

9        MR. COSGROVE:  Yes, I have, your Honor.

10           THE COURT:  Any correction you would like to

11   make?

12       MR. COSGROVE:  There were some minor changes, for

13   example, on page 5 of the Current Personal History,

14   first line, first she is the second of four children;

15   and the name of the brother in that paragraph is -- it's

16   a different brother, but there is nothing very

17   substantive, your Honor.

18           THE COURT:  All right.  And have you had the

19   chance to review it with Ms. Niver's family, and discuss

20   today's proceedings with her family?

21       MR. COSGROVE:  Yes.  I did not show them

22   word-for-word, but I have gone over the PSI's content.

23   We, I will say, that we have been in touch for the last

24   six months.  The family has been very good about keeping

25   in touch with me, your Honor.

26           THE COURT:  You can proceed.

27           MR. COSGROVE:  Your Honor, when I first saw the

1    police report and when I read about the incident, in our

2    pretrial discussions, I think I probably tried to

3    minimize the gravity of this offense in my discussions

4    with Mr. Shepack, and if I did that, I was wrong,

5    because clearly what this victim has written is a very

6    legitimate fear.  You are in a business and somebody

7    tells you I'll shoot you if you don't give me your

8    money.  That is unconscionable, to put in fear, that

9    shouldn't happen.

10        The reason I think that I made my first assessment

11    was there was also a gentleman present in the doughnut

12    shop at the time who appears, according to the police

13    report, to be laughing as this is going on, and he

14    throws over some money to Ms. Niver, too.  And my

15    impression, at the time, was that anyone who looked at

16    this woman, especially in the shape she was in at that

17    time, she is a bit heavier now because of being

18    incarcerated, your Honor, but she had been up all night

19    on a drug binge, and there is no getting around that,

20    and the point I was trying to make to Mr. Shepack was

21    that her appearance must have been ludicrous.

22        Here she is with a pocketbook saying I have got a

23    gun, not making any attempt to show a gun or anything

24    else, and demanding money, and lo and behold, people

25    turn it over to her.

26        Now I understand fully, I can feel fully for that

27    woman who wrote that letter what she must have felt.

1    She turned over her money and car keys.  And as it turns

2    out, she knew Ms. Niver's brother.  I don't know if she

3    recognized Alicja, but in any event, and I'm not trying

4    to minimize that woman's fear and feelings, your Honor,

5    but again, there was this man in there who, as I read

6    the police report, kind of assessed this for what it

7    was:  A person on drugs doing something desperate and

8    foolish.

9         And what Ms. Niver has told me all along is pretty

10   much exactly what she told the probation officer.  This

11   was so stupid and so wrong and she has been so ashamed

12   of this.

13        Among other things, she has got a very supportive

14   family, your Honor.  They are here today.  I told you,

15   they are in contact with me all the time and they are --

16   they also go to visit her every chance they get, and

17   frequently they have made the trip down to Niantic and

18   not been allowed to see her because she has been in the

19   medical unit unable to have visitors.  But they're very

20   concerned.  They're very loving, and they want to do

21   whatever they can to help, and I asked a couple of them

22   to speak to you in a few minutes, if you will allow

23   that.

24        But that being said, you know, I can't get around

25   the fact that this is a robbery.  I think in my

26   experience in this field, there are different gradations

27   of robberies.  This is not somebody walking in with a

1    gun and sticking it in somebody's face demanding money,

2    but it qualifies as robbery.  She has pled guilty to it,

3    your Honor.  I would ask you to consider the

4    circumstances, and ask you to consider what this woman

5    looked like at the time.

6        Her medical history is documented in the PSI.

7    It's a very sad history, that includes her mental health

8    medical history, as well.  But she has Parkinson's

9    Disease.  She has Crohn's disease.  She has a host of

10    ailments which have not gotten any better in the

11    Correctional Center.  But again, I can just picture

12    Mr. Shepack's response to that, and I can understand his

13    feelings.

14        There is also he made reference to, your Honor, to

15    the fact that the probation officer did not recommend

16    the AIP, in fact, recommended against it, which the

17    Court asked for a recommendation at the time of the

18    plea.  Well I would just submit to you that based on the

19    fact that Ms. Niver has been on probation before, I

20    don't think any probation officer would recommend the

21    AIP to you.  But I'm asking the Court to, after you hear

22    everything today, to take a chance and implement the

23    provisions of that program, yourself, because I think

24    this woman is a good candidate for it, and we have a few

25    specific suggestions for you.  There are some --

26    obviously, the plan is laid out in page 9 of the Special

27    Conditions.

1          In addition to all the other conditions that would

2     normally be in an AIP, and these include the

3     restitution, participation in partial hospitalization

4     program at Charlotte Hungerford; substance abuse

5     treatment, and so forth.  In addition to that, your

6     Honor, I will tell you that Connecticut Outreach West,

7     the outfit in Thomaston, which provides mental health

8     counseling and hands-on treatment, has visited her on a

9     regular basis in Niantic.  They are willing and able

10    and, you know, amply -- very capable of treating her and

11    helping her, your Honor.  The outreach manager is a

12    woman named Heather Ferricea (ph).  She has been in

13    touch with Alicja.  She has been in touch with us.  They

14    are willing and able to help her.  And we're asking that

15    if the Court does consider this plan, that you make that

16    a condition, the Connecticut Outreach West; Prime Time

17    in Torrington, she can go there.  You could impose the

18    electronic monitoring, your Honor, so if she left her

19    house and was not present when phone calls were made she

20    would be immediately arrested.  They would come for

21    her.

22         She has a personal physician, she has her own

23    physician, in Torrington, Dr. Goldman.  She needs

24    medical help.  If the Court were to impose or ask, and

25    I'm saying this, and I do think it's obvious to all she

26    has been in jail for the last six months, if you were to

27    impose a suspended sentence after the time she has

1    already served, with these conditions, she would get the

2    help she needs, your Honor, and she would be on a

3    probation with a substantial amount of time hanging over

4    her head.

5         She has learned her lesson, I believe.  If she did

6    anything wrong violating that probation, or did not live

7    up to those conditions, she would be right back in jail

8    and I couldn't make this argument to you again.  But

9    this is someone, your Honor, who has overcome quite a

10   bit in her life.  She came here from Poland.  She had to

11   learn a new language.  She had some education in

12   Poland.  She came over here and she has been a worker.

13        I couldn't have said it any better than Mr.

14   Shepack did about the scourge of drugs.  She fell into

15   this scourge, and it has really torn her and her family

16   apart, but they are here and they want to help her and

17   she wants to help herself.  I know that the Corrections

18   Department, one of their functions is to punish people.

19   But she is not getting any help in the Corrections

20   Department.  And I don't think she is going to get any

21   rehabilitation there.

22        I'm asking you to consider putting her on

23   suspended sentence, keeping in mind that she has already

24   served six months on this file, and impose these

25   conditions, your Honor, imposing these conditions that

26   she get proper medical/mental health help that she

27   needs; that she avoid any kind of substance abuse; that

 1    she be monitored by mental health agency as well as the

 2    probation department.  And this is not just showing up

 3    every couple of weeks or something for a random urine,

 4    this is on a daily basis even with the electronic

 5    bracelet, if the Court wants to order that.  The family

 6    is fully supportive, and they will see to it that they

 7    get her to those appointments, and that they keep her

 8    out of trouble.

 9        I can appreciate a victim saying put her in

10    prison, but that really is not going to help that victim

11    or anybody else.  It's certainly not going to help with

12    restitution, and it's not going to help Mrs. Niver,

13    which is also, I'm sure, a concern of the Court, but not

14    the top priority.  Obviously, it's my top priority; but

15    I would ask you to keep that in mind.

16        And I would ask you to hear from her sister, Ella,

17    and also her husband.

18        Ella, would you come forward, please?  Come on

19    up.

20        THE DEFENDANT'S SISTER:  I'm Ella Domowski (ph).

21        THE COURT:  Good afternoon.  You can start where

22    you want.

23        THE DEFENDANT'S SISTER:  I don't like to say too

24    many words but --

25        THE COURT:  Can you keep your voice up?  And come

26    a little bit farther forward, if you want, so the court

27    reporter can hear, and you just speak clearly and slowly

1    if possible.

2        THE DEFENDANT'S SISTER:  My sister and I grew up

3    together, so grew up, we were basically we were growing

4    up like twins in a way, where I was a little bit older,

5    so I was a little older than her and so forth.  So I

6    thought I know my sister pretty well, and I know my

7    sister from -- I don't cry because I can't talk.  Excuse

8    me.  I don't mean to do that.

9        Anyway, she is a very moral person.  She is very

10   compassionate.  When she got into drugs, the drugs have

11   out of her mind.  When she was on those drugs, at that

12   time, and I didn't know anything about drugs, I was

13   learning, at that time.  I realize that the drugs have

14   really put a great power on her mind and actions.  In

15   any case, when my sister -- I want to start it, I

16   believe inpatient -- and I believe in changing the

17   person to a better person, therefore, I think that I am

18   not excusing my sister for what she have done and the

19   drugs.  But I also think that a person -- I have

20   observed my sister was in prison, and learned more about

21   it, and I saw prison in her case, particularly, that in

22   her case particularly, made things worse for her because

23   when she went to prison -- when she went previously when

24   she went to jail and they put her into a -- she went as

25   a person when she was -- I could communicate with her.

26   I could talk to her.  She was normal, just when a person

27   is normal when you are not on drugs, when you are not

1    under that influence.

2         She came out of the jail, and especially because

3    when we making phone calls and all that, it seems it

4    happened when she was isolated, and locked in one room

5    for a period of time, when she came out she wasn't

6    right.  She was just -- I don't know what happened

7    there, but something happened where mentally she was

8    very affected.  And at one point I could talk to her and

9    now there was a point when she was on drugs, at some

10   point, I could talk to her and another point the whole

11   situation was totally switched.  This person was just

12   not in the right mind.  I thought so, then I thought to

13   myself I knew before that for her to be incarcerated,

14   that because she was for that, she wanted to stay and

15   really pay for all that she is paying for:  The store

16   that she was -- when she wrote the bad check to, and so

17   then I realized that really what happened was when she

18   was incarcerated, she didn't become better she became

19   worse, physically and mentally; physically, because she

20   was also suffer from Crohn's Disease, at that time, and

21   they have not given her any medication, whatsoever, even

22   though -- and then mentally, is what I said before.

23        I was hoping all along that -- and that's when she

24   came out, you know, she came to me, she was already

25   worse mentally and then when she got that doughnut shop,

26   and she, obviously, she didn't know what she was doing

27   because that is not my sister.  She is not the person to

1    ever hurt anyone.  She helps.  When she was incarcerated

2    she was helping the woman there trying to, you know,

3    when she realized that some of them didn't have any

4    money, whatsoever, to even to buy a cream for themselves

5    she would share her money with them, so she is very

6    compassionate, but she just needs the proper care, I

7    think, and she definitely is not getting it there,

8    whatsoever.

9         And talking about -- Attorney Cosgrove, about --

10   he says that -- he says think of this woman if that was

11   you -- that that was you, in that position, how scared

12   she was.  Well, I thought to myself I truly understand.

13   That is why I know the punishment should be there, but I

14   was in a situation where I was threatened from a person

15   who had mental condition, who could not afford

16   medication, and I had filed a report at that time,

17   person was arrested, but knowing that this person needed

18   treatment and nothing else because, personally, I knew

19   them before when he was on medication was a very nice

20   person.  I have made sure that this person is going to

21   get a mental health treatment not -- nothing else.

22        So I believe if all -- and I'm not blaming this

23   woman for not -- I don't know whether she realize that

24   Alicja was on drugs that time, I don't know, I don't

25   know.  All I know is that I think there is always two

26   sides to the coin to look at.  And I really want my

27   sister to get very better.  And I don't have any better

1    discussions because I don't know what else.  I thought a

2    long treatment program would be the best where she has

3    to be there and she cannot sign herself off, out of

4    that.  But I was told that such a long term treatment,

5    it's not available to her.  Is not available to her.

6         That's about it.

7         THE COURT:  Thank you very much.

8         THE DEFENDANT'S SISTER:  And I apologize for

9    emotions.

10        MR. COSGROVE:  Your Honor, could I amplify the

11   story Mrs. Domowski told you, the way she told me, she

12   was the victim of a threatening case, and it actually

13   went to court, and she was contacted by the prosecutor

14   and asked what her attitude was, and what she wanted to

15   see happen to the individual, and she communicated to

16   them this is someone who needs treatment, instead of

17   jail, and she brought that up to me.  I think it's a

18   very good point, and I think that it might be what sort

19   of what we're asking for, to consider here.  But she is

20   a victim, herself, in a case where she recognized that

21   the person who did this to her had mental problems, and

22   needed help, and that is -- I just wanted to make that

23   clear.

24        THE COURT:  Thank you.

25        MR. COSGROVE:  And I would ask to hear from her

26   husband.

27        THE COURT:  Mr. Niver?

1    MR. COSGROVE:  There are references in the PSI to

2    their marriage, and they have had their ups and downs,

3    but both of them have told me that those instances that

4    are referred to arise from the drug usage of Alicja.

5    This is not a bad husband, this is someone who responded

6    inappropriately to bad provocations, and that is

7    something that my client has told me, too.

8    THE COURT:  Good afternoon.  This is Mr. Niver.

9    MR. NIVER:  Your Honor, we have been married 18

10   years, during that time she is a very hard worker.  She

11   worked two jobs to bring her family to this country.

12   She went to college.  She was very good, and then she

13   got into the drug problem.  She came to me crying for

14   help.  We went to different places trying to get her

15   into programs, because my insurance there, it wasn't

16   accepted.

17       Your Honor, what she had done is not this person.

18   I know if it was medication, that now she has a lot of

19   medical problems, and she was on all kind of medical --

20   she was on all kind of medication, I don't know if that

21   had any influence with the drugs.

22       She is a good person.  She needs to be home, your

23   Honor.  I really don't know how to say -- I got a lot of

24   things I can say, but it just won't come out now.  I got

25   a mental block in me right now.  I don't really -- I

26   don't know how to emphasize that how hard working she

27   is.  She is very good.  She is very family oriented.

1    She loves her family; very religious girl.  And I don't

2    know --

3            THE COURT:  Thank you, Mr. Niver.

4            MR. COSGROVE:  So that it's clear, Mr. Niver loves

5    his wife, which may not account for much but --

6            And I just have one more thing, that is one thing

7    that has come through from Alicja to me for as long as I

8    have been representing her is that it's a quality and

9    emotion that I don't see very -- none of my -- many of

10   my clients, the shame for what she did.  She appreciates

11   what she did, and what she put this person through, the

12   people in the doughnut shop, as well as what she has

13   done to her family and to herself.  Again, I don't see

14   that very often.  I don't see someone who appreciates

15   what they have done, and what effect it has had on

16   everybody else.  But you do -- I do see it from her, and

17   I think that is another reason that she would be a good

18   candidate for, at this point, suspended sentence with

19   stringent conditions, your Honor, and that is what we're

20   asking the Court to impose.

21           And again, I would be happy to elaborate on any of

22   the providers if the Court has any question about who

23   she would go to, how often she would go, how she would

24   get there.  We have worked out a few things here, if the

25   Court sees fit to, and I would also say that the

26   probation officer, in speaking to both Mrs. Domowski and

27   Mr. Niver, indicated that they thought that the

1    Charlotte Hungerford program would be a good program.

2    This is a partial hospitalization program, would be a

3    good program for Mrs. Niver.

4         THE COURT:  Thank you very much, Attorney

5    Cosgrove.  I appreciate your comments and your

6    preparation in this matter.

7         Anything else, Attorney Shepack?

8         THE DEFENDANT'S SISTER:  May I just add

9    something?

10         THE COURT:  We can't hear you.  You have to come

11    forward.

12         MR. COSGROVE:  Thank you, your Honor.

13         THE DEFENDANT'S SISTER:  We didn't know about the

14    car that the woman had, but learning it now, my family

15    said they going to pay back expenses of the insurance

16    did not cover for that.  We didn't know.  We thought the

17    car was totally undamaged.

18         MR. COSGROVE:  One would think that from reading

19    the police reports and warrants.  This information came

20    in later, your Honor, but we can address that later.

21    But thank you.

22         THE COURT:  Thank you.

23         MR. SHEPACK:  No.  The only point I have is I

24    think it's an understandable practice, I did it a couple

25    of times today, offer parol evidence to modify the

26    written probation report.  And it would seem to me what

27    the probation officer intended to be in the report, it

1    should be in the report.  I don't think it's wise

2    practice to offer evidence that the probation officer

3    said X, Y and Z; probation officer's opinion was X.

4    They have a statutory and Practice Book obligation, they

5    discharge it to whatever degree they discharge it

6    through this report, and that really shouldn't accept

7    parol evidence to modify the report.

8         THE COURT:  If that was a basis for the Court's

9    decision, I would ask the writer, the probation officer,

10   to be present.

11        MR. SHEPACK:  Yes.  Right.

12        THE COURT:  Right.

13        MR. SHEPACK:  Other than that, I don't have

14   anything to add to that.

15        THE COURT:  Anything else, Attorney Cosgrove?

16        MR. COSGROVE:  No, your Honor.

17        THE COURT:  All right.

18        MR. COSGROVE:  Oh, I'm sorry.  Did you want to

19   speak to the judge?

20        THE DEFENDANT:  Yes, I would like to.  I'm

21   speechless now.  I'm sorry to have -- for being

22   emotional and all this stuff, your Honor.

23        The prosecutor, I want to say that I don't --

24   there is no excuse, whatsoever, for what I have done.

25   There is no excuse.  I, like my sister said, I can't

26   imagine that.  I mean she, that woman, she does -- knows

27   me.  She knows me, and as this person said in the

1    letter, that I scare her that much, I feel real sorry

2    for her.   I feel real sorry that I done that to her.   I

3    feel sorry that I damage her car and I'm -- the only

4    thing that I am very very grateful, your Honor, that I

5    did bring the car back to her.   I don't know I did that

6    much damage, because I was under very heavy influence of

7    drugs, your Honor, and I don't even know that God

8    brought me back to Waterbury, to Torrington, with the

9    car, because I don't know how I drove back with the

10   car.   But I had one thing on my mind, to bring the car

11   back, because I know how this -- that when you have a

12   car, and during my period of ten years when I was using

13   drugs, I destroy a lot of cars that my husband paid for

14   it, and I know what he means, because I know what he

15   went through.   Cars cost money.   And I had the one thing

16   on my mind.   I got to bring the car back to this woman

17   because I promise her, and that I remember when I said

18   to her, I said I need to borrow your car, and she said

19   I'm sure you are going to bring it back.   And I remember

20   I said I won't bring it back in the morning, I just need

21   to get going, because I needed to go and get the drugs.

22   And I remember I was saying to myself I got to bring the

23   car back, and I just -- I don't know how I brought it,

24   and I'm sorry for the damage, really.

25        It wasn't something at all -- I want to say I am

26   very sorry.   I really am.   I am very sorry.   This is --

27   it was stupid, like I said in my -- it was very stupid,

1      but at that time, the only thing that I can explain

2      myself, it's not my excuse because drugs are not

3      excused.  Drugs are not excuse.  You should -- they

4      always say you should not pick up a drug because the

5      drug will bring you a trouble, and in my situation I

6      know now I don't want to do drugs anymore, your Honor,

7      because I never done nothing like that.  I am so

8      addicted to this drug that this is first time I --

9      before it was just like a minor things, you know, like

10     cashing checks, or being arrested for a piece of crack

11     cocaine, or buy it from uncover cop, and violation of

12     probation.  And but this is -- I don't even know how I

13     managed to go and do such a thing.

14          I thought -- what I'm trying to say, your Honor,

15     that I have done a thousand dollars' worth of cocaine

16     with the other person.  What I'm trying to explain what

17     kind of state of mind I was.  And that scares me, your

18     Honor.  That really scares me, because what is going to

19     happen next?  I don't want to do it anymore.  Ten years

20     of my life, it's like -- it's like a hurricane.  It's

21     like a nightmare or hurricane passed by, it brought a

22     lot of damage between me and my family, and the worse,

23     me and my husband in our marriage.  And it destroy me

24     very -- because I think I am a good person, your Honor.

25     I am a good person.  When I'm a sober person, I am a

26     good person.  I -- I am clean person.  I like to help.

27     I love my family.  I like to spend time with them, by my

1    family.

2        When I use drugs, it's like I'm completely

3    different person.  It's like I'm night and day.  It's

4    like I become like -- animallike, change from a person

5    to a wolf.  You do things -- I have done things like I

6    would never done it in my whole life.  Like my husband

7    said that we were trying to get a help, but the problem

8    was too -- it's not only because of the insurance, in

9    getting that program, it was that guilt and those things

10   that I have done, the shame was eating me inside when I

11   was sober, the shame.  How could I have done it?  How

12   could I have done all these things?  And I, like my

13   sister said, every time when I went to prison, I was

14   just becoming just like these girls in prison.  Because

15   they call jail -- they call it Correctional

16   Institution.

17       I'm proud of myself because I did achieve

18   something this time.  I graduated Tier Two.  It was in

19   three months, and I'm proud of that, and I was going to

20   AA, and for one night and to Al-Anon, and it give me

21   something and that gives me a -- I want to change.  I

22   want to change my life.  I want to better my life.  I

23   don't want to do drugs anymore.  I don't.  I am 41 years

24   old.  I want to be -- I want my -- I want my forties

25   just like -- I want to have my thirties -- so I want my

26   forties to be my thirties.  I want my life to be just

27   like regular people, just like my family, just like

1    everybody else.  I don't want to do drugs anymore.

2         Thank you, your Honor.

3         THE COURT:  Thank you.  I think everyone here has

4    sent the same message, starting with Attorney Shepack,

5    as to the scourge of drugs in our society, and what a

6    terrible amount of harm it can do.  And certainly he has

7    expressed it and from the state's perspective.  And I

8    have heard it through the public defender, Attorney

9    Cosgrove's experience in representing you, Ms. Niver;

10   your sister, and being your sister and how she has had

11   to suffer as a result of your drug addition; your

12   husband, certainly; and then, Ms. Ferris has expressed

13   the victim's injuries as a result of your behavior while

14   you were under the influence of drugs.  And now you most

15   eloquently have stated what drugs have done and what you

16   hope to achieve once they are out of your life, and it

17   seems to me that you will do that because you are

18   certainly, from my brief encounter with you, you are

19   very intelligent, and eloquent, and sensitive person,

20   and if you have those qualities you certainly can make

21   some changes in your life.  So I have a great deal of

22   hope for you, and I think your family is behind you, so

23   that you will have some support there.

24        But the Court cannot just address the drug problem

25   in imposing a sentence.  Certainly, I want to give you

26   the opportunity to conquer this, and I will order

27   certain conditions of probation that will, I hope, help

1    you along.

2         But the Court, unlike your attorney, and unlike

3    the state's attorney, I have several things I have to

4    think about in imposing a fair and appropriate

5    sentence.  One of them is the nature and the seriousness

6    of the offense.  And I think you know how serious this

7    offense was.  I have to consider the effect on the

8    victim and what -- whether it was serious in your injury

9    to her, whether it has changed her life in a way.  I

10   consider that.  I consider the impact on society of the

11   offense; and I consider your rehabilitation and your

12   future in society, in trying to craft an appropriate

13   sentence.  It's not, certainly not easy, although both

14   counsel make it a lot easier for me because they both

15   bring out things I have to consider.

16        I will not suspend the sentence in this case.  I

17   will not enter a split sentence; however, I will

18   consider that part of the time which the state is urging

19   the Court to impose as incarceration will be suspended

20   in light of my optimism that Mrs. Niver will be able to

21   make some progress on probation.

22        Accordingly, it is the sentence of this Court that

23   on the charge of Robbery in the Third Degree, you are

24   committed to the custody of Commissioner of Corrections

25   for a period of five years, execution suspended after

26   three years; five years probation.

27        And on the count of Larceny in the Third Degree,

1    for a period of five years execution suspended; those

2    sentences to run consecutively, for a total effective

3    sentence of ten years, execution suspended after three

4    years, five years probation.

5        The conditions of the probation are that you

6    submit to any substance abuse evaluation and treatment

7    that probation feels appropriate; that would include

8    inpatient treatment; and that you complete any inpatient

9    treatment satisfactorily; that you submit to random

10   urines thereafter; that you participate in any mental

11   health counseling that probation feels appropriate; that

12   you abide by any medication that your physician

13   prescribes; that you have no contact with the victim in

14   this case, Theresa McLellan; nor that you go to the

15   location where this incident took place, Coffee House

16   Plus, in Torrington.

17       The Court further orders that you make restitution

18   in an amount to be determined by probation, after

19   documentation.  In no event is it to be greater than

20   $4,500.

21       Ms. Niver, I was particularly struck by your

22   comment in the pre-sentence investigation report it's

23   hard to face the shame/guilt sober, and that is what you

24   have to do, and you are going to have to face a lot of

25   things sober and learn that that is really the only way

26   you are going to succeed, but it's not going to be easy

27   for you or for your family.

1          MR. COSGROVE:  Costs and fees, your Honor, are

2     they waived?

3          THE COURT:  Yes.

4          MR. COSGROVE:  Thank you.

5          MR. SHEPACK:  If there are any open counts the

6     state will nolle.

7          THE CLERK:  There is an open file, reckless

8     driving.

9          MR. SHEPACK:  The state will nolle open count --

10    open files.

11         THE CLERK:  Thank you.

12         THE COURT:  How about property?

13         THE CLERK:  No property, your Honor.

14         MR. SHEPACK:  I believe that is -- the docket,

15    your Honor.

16         THE COURT:  Thank you.

17         MR. COSGROVE:  Thank you, your Honor.

18         THE COURT:  Good luck, Ms. Niver.

19         (The hearing was concluded.)

20

21

22

23

24

25

26

27

30

1

2

3

4

5

6

7                    C E R T I F I C A T I O N

8

9        This is to certify that I, Barbara J. Miller, a Notary

10   Public and Court Reporter in and for the State of Connecticut

11   certify that the foregoing is a true and accurate transcript

12   of my stenographic notes, taken with respect to the

13   above-entitled matter, heard at the Litchfield Superior Court

14   on December 3, 1999.

15        Dated at Litchfield, Connecticut, on this 25th day of

16   November, 2003.

17

18

19

20   _____

21                         Barbara J. Miller, RPR-CSR

22

23

24

25

26

27